Filed: December 2, 2011

IN THE SUPREME COURT OF THE STATE OF OREGON

MAYOLA WILLIAMS,
Personal Representative of the
Estate of Jesse D. Williams, Deceased,

Plaintiff-Appellant,

and

STATE OF OREGON,
acting by and through the Department of Justice,

Cross-Appellant
Cross-Respondent,

v.

RJ REYNOLDS TOBACCO COMPANY;
FRED MEYER, INCORPORATED;
and PHILIP MORRIS COMPANIES, INC.,

Defendants,

and

PHILIP MORRIS, INC.,
nka Philip Morris USA, Inc.,

Defendant-Respondent
Cross-Respondent.

(CC 970503957; SC S059014 (Control))
_____

STATE OF OREGON,

Plaintiff-Appellant,

v.

AMERICAN TOBACCO COMPANY, INC., et al.,

Defendants,

and

PHILIP MORRIS, INC.,

Defendant-Respondent.

(CC 970604457; SC S059248)

On appeal certified from the Court of Appeals on appeal from a judgment of the Multnomah County Circuit Court.

Janice R. Wilson, Judge.

Argued and submitted September 19, 2011.

James S. Coon, Swanson Thomas & Coon, Portland, argued the cause for appellant, Mayola Williams, and Stephanie Striffler, Senior Assistant Attorney General, Salem, argued the cause for cross-appellant-cross-respondent State of Oregon. James S. Coon filed the briefs for Appellant. With Stephanie Striffler on the briefs for cross-appellant-cross-respondent were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

William F. Gary, Harrang Long Gary Rudnick PC, Eugene, argued the cause for respondent-cross-respondent Philip Morris United States of America Incorporated. With him on the answering brief was Sharon A. Rudnick.

Lisa T. Hunt, Portland, filed a brief on behalf of *amici curiae* American Lung Association of the Mountain Pacific, American Cancer Society, Campaign for Tobacco Free Kids, Upstream Public Health and the Tobacco-Free Coalition.

Janine Robben, Oregon Crime Victims Law Center, Portland, filed a brief on behalf of *amicus curiae* Oregon Crime Victims Law Center.

Margaret Garvin, Executive Director, National Crime Victim Law Institute, at Lewis & Clark Law School, Portland, filed a brief on behalf of *amicus curiae* National Crime Victim Law Institute.

Before De Muniz, Chief Justice, and Durham, Kistler, Walters, and Linder,

2

Justices.*

DE MUNIZ, C. J.

The judgment of the circuit court in *Williams v. Philip Morris* (CC970503957) is reversed, and the case is remanded for entry of a judgment consistent with this opinion. The post-judgment order in *State v. American Tobacco Co.* (CC 970604457) is reversed.

*Balmer and Landau, JJ., did not participate in the consideration or decision of this case.

DE MUNIZ, C. J.

This is a certified appeal from the Court of Appeals. *See* ORS 19.405 (describing process for certification of appeal to this court). The dispute arises out of the case of *Williams v. Philip Morris, Inc.*, in which, in 1999, a jury awarded the Estate of Jesse Williams (the Williams estate) compensatory damages and $79.5 million in punitive damages for Philip Morris, Inc.'s (Philip Morris) fraud and negligence leading to the smoking-related lung cancer death of Jesse Williams. After over a decade of appeals, during which the case has been before this court multiple times, the punitive damages award now has been affirmed.[1] Philip Morris has paid the compensatory damages and part of the punitive damages to the Williams estate, but has refused to pay the 60 percent of the jury's punitive damages award that is allocated to the state under Oregon's split recovery statute, ORS 31.735.[2] The state and the Williams estate have sought to force Philip Morris to pay that 60 percent share, either to the state, as the statute directs, or, alternatively, to the Williams estate. The trial court ruled that the state had released its

---

[1] *Williams v. Philip Morris Inc.*, 335 Or 142, 61 P3d 938 (2002), *rev'd and rem'd*, 540 US 801, 124 S Ct 56, 157 L Ed 2d 12 (2003), *on remand*, 340 Or 35, 127 P3d 1165 (2006), *rev'd and rem'd*, 549 US 346, 127 S Ct 1057, 166 L Ed 2d 940 (2007), *on remand*, 344 Or 45, 176 P3d 1255 (2008), *cert dismissed as improvidently granted,* 556 US 178, 129 S Ct 1436, 173 L Ed 2d 346 (2009).

[2] At the time that the complaint in *Williams v. Philip Morris, Inc.* was filed, Oregon's split recovery statute was numbered as ORS 18.540. In 2003, it was renumbered as ORS 31.735. For convenience, we refer to that statute at all times in this opinion as it is currently codified. We set out the text of ORS 31.735 later in this opinion.

1

claim to those punitive damages in a settlement agreement in another action, and that the Williams estate also has no right to the portion of the punitive damages award allocated to the state under ORS 31.735. The state and the Williams estate appealed that ruling to the Court of Appeals, which certified the appeal to this court. We now hold that the state's statutory right to a share of punitive damages is not a "released claim," as that term is defined in the settlement agreement in the other action, and therefore, the state did not release its right to pursue payment of its statutory interest in 60 percent of the *Williams* punitive damages award when it settled that other action. We therefore reverse the judgment of the trial court.

The following facts are undisputed. For decades, Jesse Williams smoked cigarettes manufactured and marketed by Philip Morris. In March 1997, Williams died of lung cancer, and later that year, his estate filed a complaint against Philip Morris, alleging that the company's fraud and negligence caused his death. In November 1998, the Williams estate moved to amend the complaint to add a claim for punitive damages. Philip Morris opposed that motion, but the trial court granted the estate leave to file the amended complaint in December 1998. In March 1999, a jury returned a verdict in favor of the Williams estate, awarding the estate economic and noneconomic damages on the negligence and fraud claims, and awarding $79.5 million in punitive damages on the fraud claim. As noted, the case, and particularly the punitive damages award, has been the subject of protracted appeals in this court and in the United States Supreme Court. This court ultimately affirmed the punitive damages award, *Williams v. Philip Morris Inc.*, 344 Or 45, 176 P3d 1255 (2008), *cert dismissed as improvidently granted*, 556 US

2

178, 129 S Ct 1436, 173 L Ed 2d 346 (2009), and the appellate judgment issued in 2009.

Also in 1997, the State of Oregon filed an action against Philip Morris and other major domestic cigarette manufacturers and distributors of tobacco products, alleging unfair trade practices, ORICO violations, and other claims. In *State v. American Tobacco Co., Inc., et al.* (*State v. Philip Morris*),[3] the state alleged that it had incurred hundreds of millions of dollars in increased Medicaid expenses for medical care for low-income Oregon residents and increased health insurance premiums for public employees as a result of the tobacco companies' unlawful conduct. In 1998, Oregon settled its claims against the tobacco companies when its attorney general, and the attorneys general of 45 other states, entered into a "Master Settlement Agreement" (MSA), a global settlement agreement with Philip Morris and the other tobacco companies. As part of the MSA, the tobacco companies agreed, among other things, to make annual payments to the settling states to compensate the states for past and future health care expenses. They also agreed to adhere to restrictions on their advertising and marketing. In return, the settling states agreed to release the tobacco companies from past and future claims relating to the manufacturing of, sale of, and exposure to tobacco products, as well as claims relating to research, statements, or warnings regarding tobacco products.[4] Oregon

---

[3]    Although the case is denominated *State v. American Tobacco Co., Inc., et al*, in the trial court register and throughout the appellate process, the parties have always referred to the case as *State v. Philip Morris*. For convenience, we do the same in this opinion.

[4]    The terms of the MSA release provisions are set out later in this opinion.

Attorney General Hardy Myers signed the MSA in November 1998, and the trial court entered a consent decree based on that agreement in December 1998.

In April 1999, after the jury returned the verdict in *Williams v. Philip Morris*, Philip Morris sent the Oregon Attorney General a letter asserting that the MSA released Philip Morris from its obligation under ORS 31.735 to pay the state its 60 percent share of the punitive damages award.[5] The state then moved in *State v. Philip Morris* for declaratory relief concerning its entitlement to part of the punitive damages

---

[5] ORS 31.735 provides, in part:

"(1) Upon the entry of a verdict including an award of punitive damages, the Department of Justice shall become a judgment creditor as to the punitive damages portion of the award to which the Criminal Injuries Compensation Account is entitled pursuant to paragraph (b) of this subsection, and the punitive damage portion of an award shall be allocated as follows:

"(a) Forty percent shall be paid to the prevailing party.  * * *

"(b) Sixty percent shall be paid to the Criminal Injuries Compensation Account of the Department of Justice Crime Victims' Assistance Section to be used for the purposes set forth in ORS chapter 147.  * * *

"* * * * *

"(3) Upon the entry of a verdict including an award of punitive damages, the prevailing party shall provide notice of the verdict to the Department of Justice.  In addition, upon entry of a judgment based on a verdict that includes an award of punitive damages, the prevailing party shall provide notice of the judgment to the Department of Justice.  The notices required under this subsection must be in writing and must be delivered to the Department of Justice Crime Victims' Assistance Section in Salem, Oregon within five days after the entry of the verdict or judgment."

4

awarded in *Williams*. The trial court stayed the proceedings pending the outcome of the *Williams* appeals.

After the *Williams* punitive damages award was affirmed on appeal in 2009, Philip Morris paid the Williams estate over $61 million in full satisfaction of the award of economic and noneconomic damages, and in full satisfaction of the estate's interest in 40 percent of the punitive damages award allocated to the Williams estate under ORS 31.735, plus costs and interest on those awards. The Williams estate executed a partial satisfaction of money judgment, but asserted that, if the state had released its share of the punitive damages award, then the estate was entitled to recover that share.[6]

The trial court then lifted the stay in *State v. Philip Morris* and recommenced the proceedings on the state's action to construe the terms of the MSA. The court consolidated *Williams v. Philip Morris* and *State v. Philip Morris* to decide the legal questions surrounding entitlement to the punitive damages award: *viz.*, whether by signing the MSA, the state released its allocated share in the *Williams* punitive damages award and, if so, what should happen to that money.

In briefs and in arguments in the consolidated cases, the state and the

---

[6] By our calculations, today (12 years after the entry of the judgment in the *Williams* case), the remaining 60 percent of the punitive damages award, plus accrued simple interest at nine percent per annum, amounts to over $99 million. ORS 82.010(2)(b) (providing for simple interest on judgments at rate of nine percent per annum).

Williams estate contended that the state's statutory allocation of 60 percent of any eventual punitive damages award was not a "Claim" or a "Released Claim" under the MSA, because the state was entitled to a share of the punitive damages award by operation of law, or alternatively that the MSA was at least ambiguous as to whether the state had released its right to recover 60 percent of the punitive damages award.[7] In that latter regard, the Williams estate also argued that the MSA contained conflicting provisions, one appearing to provide that the state released claims for punitive damages, and another appearing to provide that such claims are not part of the settlement.

In addition, both the state and the Williams estate argued that extrinsic evidence supported their position that the state had not released its right to the 60 percent allocation of the punitive damages award under ORS 31.735. In particular, they asserted

---

[7] In 2004, the state and the Williams estate entered into an agreement to cooperate in an effort to ensure that Philip Morris is required to pay the entire amount of the punitive damages awarded in *Williams*, and to share those funds if successful. In part the agreement provides:

> "8. Any amount recovered by the State of Oregon or by the Williams Estate or both in *State of Oregon v. Philip Morris*, whether by litigation to final judgment, by settlement, or by any other means, shall be paid 55% to the State of Oregon and 45% to the Williams Estate and its attorneys. In the event that Philip Morris pays 100% of the final appellate judgment in *Williams v. Philip Morris* with or without litigating *State of Oregon v. Philip Morris*, the State of Oregon would receive 33.33% of the total punitive damages recovered, and the Williams Estate and its attorneys would receive 66.67% of the total punitive damages recovered."

Under that agreement, the state and the Williams estate each argued at the trial court level and in this court that the state had not released its statutory share of the punitive damages award when it entered into the MSA, and, if it had, then the estate was entitled to recover that part of the award.

6

that, when the Oregon Attorney General signed the MSA, he was aware of the *Williams* case and the fact that the Williams estate claimed punitive damages, and that, by the end of December 1998, only a few weeks after signing the MSA, the Attorney General wrote at least two official letters assuring the recipients of those letters that the settlement would not affect any interest of the state's other than those the state asserted in *State v. Philip Morris*. In addition, the state and the Williams estate argued that Philip Morris appeared to share that belief, pointing to evidence that, on December 22, 1998, counsel for the tobacco companies (including Philip Morris) sent a notice to the attorneys general, as required by the MSA, listing "potential released claims" under the MSA. The tobacco companies described the list as "substantially over inclusive" in an "exercise of caution" to include every known case in which there was a "colorable possibility" of a released claim. Although the *Williams* case was pending at that time, it was not included in the tobacco companies' list.

In response, Philip Morris argued that the wording of the MSA release provisions is extraordinarily broad and encompasses the state's interest in its statutory share of the punitive damages award. Philip Morris contended that, properly understood, the MSA does not contain any provision that contradicts that broad release provision. Urging that the MSA is not ambiguous, Philip Morris moved to strike the extrinsic evidence of the parties' intent in entering into the MSA not to release the state's share of any punitive damages award in *Williams*. Finally, Philip Morris argued that the Williams estate was not entitled to the state's share of the punitive damages award because, under the split recovery statute, plaintiffs acquire no right, entitlement, property interest, or

7

even expectation interest in the state's statutory allocation of a punitive damages award.

The trial court ultimately ruled in Philip Morris's favor on all points. The court concluded that (1) the state had released its right to a share of the *Williams* punitive damages award by entering into the MSA; (2) the MSA was not ambiguous, and, therefore, there was no need for extrinsic evidence of the parties' intent,[8] and (3) the Williams estate was not entitled to the unpaid 60 percent of the jury's punitive damages verdict. As to the MSA's release provisions, the trial court stated:

"The State's claim for money from Philip Morris pursuant to the judgment in the *Williams* case arises, at least indirectly, from and is certainly 'in any way related' to conduct arising out of and related to the use, sale, distribution, advertising, marketing or health effects of tobacco. The State's right to the money at issue arose precisely because the jury imposed punitive damages against Philip Morris in its verdict for the type of conduct described in the MSA. There simply would have been no verdict for punitive damages and no judgment as to which the State is a creditor but for the described conduct."

In concluding that the MSA is not ambiguous, the trial court stated:

"I find nothing contradictory about those two provisions [one releasing claims for, among other things, punitive damages, and another stating that no part of any payment under the MSA is for, among other things, punitive damages]. It is more common than not in settlement agreements for the releasing language to be as broad as the defendant can make it and the plaintiff will allow, while there is often some limiting characterization of the payment made. Often the characterization is made

---

[8] In addition to concluding that the MSA was not ambiguous, the trial court concluded that the Attorney General's opinion about the meaning of the agreement, disclosed to nonparties after the agreement was signed, was not probative, and that the letter from the tobacco companies listing all the released claims was not probative because it was generated in fulfillment of a notice obligation under the MSA and was not produced as part of some due diligence before the settlement itself was reached.

8

for tax reasons -- sometimes for the plaintiff's benefit, sometimes for the defendant's.

"Following the Williams Estate's argument, any time the language in a settlement agreement characterizing a settlement payment is not identical to the language characterizing the claims released, the settlement agreement would be ambiguous, and that is not sound reasoning factually or legally."

Finally, with respect to the Williams estate's right to the state's allocation of the punitive damages award, the court stated:

"I conclude that the state became a judgment creditor [under ORS 31.735, when the jury returned the verdict awarding punitive damages], but had released its right to collect. The Williams estate never had an interest in the portion of the punitive damages award allocated by statute to the State, and the State's release through the MSA did not create such an interest in the Williams estate. So I conclude that the estate is not entitled to the remaining portion of the punitive damages award in that verdict."

The state and the Williams estate each filed notices of appeal in the Court of Appeals. The Court of Appeals, noting (1) that this court already has reviewed much of the record of the case in deciding *Williams v. Philip Morris* and is familiar with the facts and issues surrounding the award of punitive damages, and (2) that review in this court appeared to be inevitable because of the amount of money at stake and because of the important issues to be resolved, unanimously decided to certify the appeals to this court. This court accepted certification.

Our analysis of the legal issues presented in this case requires that we interpret the MSA. To begin that analysis, we set out the operative terms of the agreement, starting with the release itself.

The MSA includes the following provision, in a section entitled "SETTLING STATES' RELEASE, DISCHARGE AND COVENANT," under the

9

heading "Release":

"(1) Upon the occurrence of State-Specific Finality in a Settling State, such Settling State shall absolutely and unconditionally release and forever discharge all Released Parties from all Released Claims that the Releasing Parties directly, indirectly, derivatively or in any other capacity ever had, now have, or hereafter can, shall or may have.

"* * * * *

"(3) Each Settling State (for itself and for the Releasing Parties) further covenants and agrees that it (and the Releasing Parties) shall not after the occurrence of State Specific Finality sue or seek to establish civil liability against any Released Party based, in whole or in part, upon any of the Released Claims, and further agrees that such covenant and agreement shall be a complete defense to any such civil action or proceeding."

Oregon, as one of the 46 signatories to the MSA, is a "Settling State." Additionally, it is undisputed that, under the MSA, the state is a "Releasing Party" and that Philip Morris is a "Released Party."[9] Accordingly, under the "Release," the state "absolutely and

---

[9]    "Releasing Party" is defined as follows:

"'Releasing Parties' means each Settling State and any of its past, present and future agents, officials acting in their official capacities, legal representatives, agencies, departments, commissions and divisions; and also means, to the full extent of the power of the signatories hereto to release past, present and future claims, the following: (1) any Settling State's subdivisions * * *, public entities, public instrumentalities and public educational institutions; and (2) persons or entities acting in a parens patriae, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or any other capacity, whether or not any of them participate in this settlement, (A) to the extent that any such person or entity is seeking relief on behalf of or generally applicable to the general public in such Settling State or the people of the State, as opposed solely to private or individual relief for separate and distinct injuries, or (B) to the extent that any such entity (as opposed to an individual) is seeking recovery of health-care expenses * * * paid or reimbursed, directly or indirectly, by a Settling State."

10

unconditionally release[d] and forever discharge[d]" Philip Morris from all "Released Claims" that it then had or ever would have.

"Released Claims" are defined, in pertinent part, as

"(1) for past conduct, acts or omissions (including any damages incurred in the future arising from such past conduct, acts or omissions), those Claims directly or indirectly based on, arising out of or in any way related, in whole or in part, to (A) the use, sale, distribution, manufacture, development, advertising, marketing or health effects of, (B) the exposure to, or (C) research, statement or warnings regarding Tobacco Products * * *."

"Claims," in turn, are defined as

"any and all manner of civil (i.e., non-criminal): claims, demands, actions, suits, causes of action, damages (whenever incurred), liabilities of any nature including civil penalties and punitive damages, as well as costs, expenses and attorneys' fees * * *, known or unknown, suspected or unsuspected, accrued or unaccrued, whether legal, equitable, or statutory."

To resolve a dispute over the meaning of a contractual provision, this court first considers the text of the disputed provision in the context of the contract as a whole to determine whether the disputed provision is ambiguous. *Yogman v. Parrott*, 325 Or 358, 361-63, 937 P2d 1019 (1997). A contractual provision is ambiguous if its wording can, in context, reasonably be given more than one plausible interpretation. *Pacific First*

"Released Party" is defined as follows:

"'Released Parties' means all Participating Manufacturers, their past, present and future Affiliates, and the respective divisions, officers, directors, employees, representatives, insurers, underwriters, Tobacco-Related Organizations, trade associations, suppliers, agents, auditors, advertising agencies, public relations entities, attorneys, retailers and distributors of any Participating Manufacturer or of any such Affiliate * * *."

*Bank v. New Morgan Park Corp.*, 319 Or 342, 348, 876 P2d 761 (1994). Whether a provision is ambiguous is a question of law, as is the meaning of an unambiguous provision. *State v. Heisser*, 350 Or 12, 25-26, 249 P3d 113 (2011). The court must, if possible, construe the contract so as to give effect to all of its provisions. *Johnson v. School District No. 12*, 210 Or 585, 592, 312 P2d 591 (1957); *see* ORS 42.230 (in construing a document, court is "to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such construction is, if possible, to be adopted as will give effect to all"). If the meaning of the provision is clear from the text and context, then the analysis ends. *Yogman*, 325 Or at 361. If the provision is ambiguous, the court moves to the second step of the analysis, which is to consider other evidence of the parties' intent. *Id.* at 363.

With that interpretive paradigm in mind, we turn to the principal question before us: whether the MSA's definitions of "Claims" or "Released Claims" encompass the state's interest in an allocation of the *Williams* punitive damages award. Before we determine whether those terms apply to the state's allocation, however, we think it is helpful first to examine the nature of the state's interest.

The state was not a party in *Williams*: it did not directly bring a claim, make a demand, file an action or suit, assert a cause of action, allege damages, or assert a liability based on the smoking and health-related conduct described in the MSA's definition of "Released Claims." In other words, the state's interest does not arise out of any direct participation in the *Williams* case. Rather, the state's interest arose by

12

operation of Oregon's split recovery statute, ORS 31.735.  For convenience, we set out the pertinent parts of ORS 31.735 again here:

> "(1) Upon the entry of a verdict including an award of punitive damages, the Department of Justice shall become a judgment creditor as to the punitive damages portion of the award to which the Criminal Injuries Compensation Account is entitled pursuant to paragraph (b) of this subsection, and the punitive damage portion of an award shall be allocated as follows:

> "(a) Forty percent shall be paid to the prevailing party.  * * *

> "(b) Sixty percent shall be paid to the Criminal Injuries Compensation Account of the Department of Justice Crime Victims' Assistance Section to be used for the purposes set forth in ORS chapter 147.  * * *

> "* * * * *

> "(3) Upon the entry of a verdict including an award of punitive damages, the prevailing party shall provide notice of the verdict to the Department of Justice.  In addition, upon entry of a judgment based on a verdict that includes an award of punitive damages, the prevailing party shall provide notice of the judgment to the Department of Justice.  The notices required under this subsection must be in writing and must be delivered to the Department of Justice Crime Victims' Assistance Section in Salem, Oregon within five days after the entry of the verdict or judgment."

As the terms of ORS 31.735 provide, the statute applies without regard to the subject matter or nature of any claims made in a civil action in which punitive damages are awarded.  If a jury awards punitive damages, the state becomes a judgment creditor on entry of the verdict as to the "portion of the [punitive damages] award to which the Criminal Injuries Compensation Account is entitled" under the statute.  The judgment of the court must allocate shares of any punitive damage award according to the percentages set out in ORS 31.735(1)(a) and (b), regardless of the conduct that triggered the award.  In other words, the statute is blind to the nature of the underlying action and

13

the conduct that gave rise to it.

It is true that subsection (1) makes the state a "judgment creditor" on entry of a verdict that includes an award of punitive damages, but the statute does not require the state to take any particular action to assert its right to the 60 percent allocation of a punitive damages award as set out in paragraph (1)(b). Rather, as this court explained in *Patton v. Target Corp.*, 349 Or 230, 235-43, 242 P3d 611 (2010), the state's status as a judgment creditor serves another purpose, which a brief description of the history of the statute helps to elucidate. When Oregon's split recovery statute first was enacted, it mandated how punitive damages awards were to be distributed; it did not make the state a judgment creditor. Over time, the legislature became aware that, on occasion, the parties to litigation in which punitive damages were awarded agreed before judgment to settle their cases to avoid paying the state a share of the punitive damages award. To prevent that type of agreement, the legislature ultimately amended the statute to make the state a judgment creditor on entry of a verdict. In *Patton*, this court held that the state's status as a judgment creditor on entry of a verdict that includes an award of punitive damages confers no specific rights or obligations on the state before the judgment is entered. 349 Or at 243.[10] The parties remain free to settle the case as they see fit. The state's consent

---

[10]     In *Patton*, a former employee of Target successfully sued the company for wrongful discharge, and a jury awarded the employee a substantial sum in punitive damages. After the verdict, but before the trial court entered judgment, the employee and Target entered into a settlement agreement that eliminated the state's share of the punitive damages award under ORS 31.735, and jointly moved the court to approve a stipulated judgment dismissing the case. The state filed a complaint in intervention in the case,

14

to the settlement is not required even if the settlement reduces or eliminates the punitive damages award that would be allocated to the state under ORS 31.735. However, once a court has entered judgment awarding punitive damages, and only then, does the state have the right of a judgment creditor to enforce the statutory allocation of part of the punitive damages award to the crime victims' fund.

Under ORS 31.735, the state's statutory interest in 60 percent of a punitive damages award arises by operation of law. Moreover, the statutory designation of the state as a judgment creditor is a mechanism that allows the state to enforce compliance with ORS 31.735; it does not change the nature of the state's interest. We have already noted that the state does not and never did have any *direct* claim, demand, action, suit, cause of action, damages, or liability for any tobacco related conduct in *Williams*. It was not a party to that case. The question, then, is whether the state's statutory interest, or its effort to enforce payment of that statutory interest, nonetheless is a "Claim" or a "Released Claim" under the definition of those terms in the MSA.

Under the MSA, "Claims" means:

> "any and all manner of civil (i.e., non-criminal): claims, demands, actions,
> suits, causes of action, damages (whenever incurred), liabilities of any

---

arguing that it had a vested interest in 60 percent of the punitive damages award and that the parties, therefore, were precluded from settling the case without its consent. This court held that, at the time of entry of a verdict awarding punitive damages, the state had, "at most, an economic expectancy of 60 percent of whatever portion of punitive damages, if any, eventually is memorialized in a judgment." 349 Or at 239. However, the state did not have the right to block a settlement; its consent was not a prerequisite to any post-verdict settlement between the parties. *Id*. at 343-44.

15

nature including civil penalties and punitive damages, as well as costs, expenses and attorney's fees * * *."

We agree that, by covering "any and all manner" of various types of claims, the definition of "Claims" is very broad and could be seen to cover the state's action to collect under ORS 31. 735. However, even assuming, for purposes of argument here, that the state's action is a "Claim" as that term is defined in the MSA, we have no trouble concluding that it is not a "Released Claim."

Under the MSA's release provision, the state released "all Released Parties from all Released Claims that the Releasing Parties directly, indirectly, derivatively or in any other capacity ever had, now have, or hereafter can, shall or may have." The definition of "Released Claims" is bifurcated into separate definitions for past and future conduct, acts, or omissions. As relevant here, "Released Claims * * * for past conduct, acts or omissions" are

"those Claims directly or indirectly based on, arising out of or in any way related, in whole or in part, to (A) the use, sale, distribution, manufacture, development, advertising, marketing or health effects of, (B) the exposure to, or (C) research, statement or warnings regarding Tobacco Products * * *."

In other words, the state released only those "Claims" that are "directly or indirectly based on, arising out of or in any way related" to the described tobacco-related conduct. As we already have explained, the state's interest in the 60 percent share arises by operation of law. If Philip Morris continues to refuse to pay the 60 percent it owes the crime victims' fund under ORS 31.735, the state may have to take steps to execute on the judgment to force Philip Morris to pay it, but that claim will be to enforce the statute, not

16

to recover damages for Philip Morris's tobacco-related conduct.  And while it could be said that the state's *interest* in a share of the *Williams* punitive damages award is indirectly related in some way to the *Williams* case, its effort to secure payment under the statute is not related in any way to that case.

Philip Morris counters that

"[t]he State's claim under ORS 31.735 in this case only exists because the Williams Estate sued and recovered based on the same past conduct that formed the basis of the State's claims against [Philip Morris] and which expressly defines the scope of release.  Therefore, even if the State's claim under ORS 31.735 for 60% of the *Williams* punitive damages award could properly be classified as one 'for a statutory allocation' rather than one 'for conduct,' it would *still* be a claim 'indirectly based on, arising out of or in any way related, in whole or in part, to' the conduct that formed the basis of the claims in *Williams*."

(Emphasis in original.)  It is true that the state's statutory entitlement to a share of the punitive damages award in *Williams* "only exists" because the Williams estate sued Philip Morris for tobacco-related conduct.  However, the fact that there is a but-for causal connection between the *Williams* case (and Philip Morris's tobacco-related conduct that triggered the punitive damages award in that case) and the state's entitlement to part of the punitive damages award does not change the legal nature of the state's interest in its share of that award.[11]  The state's interest in the punitive damages award arises out of a

---

[11]     We also reject Philip Morris's assertion that the Williams estate sued and recovered based on "the same past conduct that formed the basis of the State's claims" against Philip Morris.  The state sued Philip Morris and other tobacco companies to recover for the state's own increased health care costs arising out of the tobacco companies' tobacco-related conduct.  The Williams estate, by contrast, sued and recovered based on misconduct directed at Jesse Williams, not at the people of the State

17

statute that is indifferent to the factual basis of the underlying litigation. The state's entitlement to the statutory share is not, even indirectly, related to or dependent on the tobacco-related conduct that is described in the MSA.

Philip Morris also argues that, by seeking a post-judgment declaration in the trial court as to the correctness of Philip Morris's interpretation of the MSA, the state has sought to establish liability for the statutory share of the punitive damages award in *Williams*, which itself constitutes a "Released Claim" under the MSA. In support of that position, Philip Morris contends that, under this court's decision in *DeMendoza v. Huffman*, 334 Or 425, 449, 51 P3d 1232 (2002), it is *only* the state that has ever had an interest in the punitive damages awarded in *Williams*.

We disagree. First, in *DeMendoza*, this court did *not* hold that only the state ever has an interest in the part of the punitive damages award allocated to the state under ORS 31.735, or that plaintiffs never have any interest in the entirety of a punitive damages award. Rather, the court ruled only that a plaintiff does not have a *constitutionally vested* prejudgment property right in punitive damages, which, under Article I, section 18, of the Oregon Constitution, could not be taken for public use without just compensation. 344 Or at 449. More importantly, *DeMendoza* says nothing

of Oregon. As Philip Morris itself has argued so strenuously in this court in earlier cases, and as the United States Supreme Court affirmed, punitive damages may not be awarded to punish a defendant for harms to persons who were not parties to the litigation. *Philip Morris USA v. Williams*, 549 US 346, 353, 127 S Ct 1057, 166 L Ed 2d 940 (2007); *Williams v. Philip Morris Inc.*, 344 Or 45, 48-55, 176 1255 (2008) (discussing history of the case).

18

about whether the state has a claim for punitive damages under ORS 31.735. It also is noteworthy that, in *Patton*, this court held that, up until entry of the judgment awarding punitive damages, the plaintiff controls the claim for punitive damages: the plaintiff can expand the claim or drop it, and, even after a jury renders a verdict awarding punitive damages, the plaintiff can settle away a punitive damages award. *See Patton*, 349 Or at 243-44. The state is powerless to stop a plaintiff from depriving the state of its share of a punitive damages award up to that point. *Id.* Second, as we already have discussed, the state's entitlement to a share of a punitive damages award in *Williams* is not even indirectly related to the tobacco-related conduct identified in the MSA. Rather, that entitlement arose by operation of law. In other words, the state's effort to obtain its statutory share was based on Philip Morris's refusal to pay the allocation as required by the statute, not on Philip Morris's tobacco-related conduct. The state's pursuit of a trial court declaration that Philip Morris's interpretation of the MSA was incorrect is not a "Released Claim."

Based on the foregoing, we hold that the state's interest in a share of the *Williams* punitive damages award was not a "Released Claim" under the MSA. The state did not release any claim to that money.

Alternatively, Philip Morris argues that the state, in executing the MSA, promised that Philip Morris and the other tobacco companies would have no further liability, not just to the state, but also to *third parties* acting on the public's behalf with respect to smoking and health related claims. To that end, the definitions of "Released Claim" and "Releasing Parties" explicitly contemplate that the release will apply to

19

claims brought by persons other than the state for the benefit of the public. And, under those definitions, Philip Morris argues, the Williams estate is a "Releasing Party" and its claim for punitive damages, at least to the extent that those damages are allocated to the state's crime victim's fund, is a "Released Claim."

The MSA defines "Releasing Party" to include:

> "persons or entities acting in a parens patriae, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or other capacity, whether or not any of them participate in this settlement, (A) to the extent that any such person or entity is seeking relief on behalf of or generally applicable to the general public in such Settling State or the people of the State, as opposed solely to private or individual relief for separate and distinct injuries."

Philip Morris argues that the obvious purpose of that provision is to prevent persons other than the state from recovering on the *public's* behalf from Philip Morris for the same alleged misconduct, and it would vitiate the provision if the public could recover from Philip Morris again for the same misconduct simply because the action was not brought by the state but by some third party also acting on behalf of the public. In this case, according to Philip Morris, the Williams estate was suing, in part, for the public's 60 percent share, a share that, it contends, under this court's decision in *DeMendoza*, the Williams estate never had an interest in. Thus, Philip Morris concludes, even if the claim to the state's 60 percent share of the *Williams* punitive damages award actually is a claim by the Williams estate, it would still be a "Released Claim" under the MSA because the Williams estate was seeking relief that, under ORS 31.735, could inure only to the benefit of the public.

The short answer to Philip Morris's argument lies in the wording of the

20

MSA's definition of "Releasing Party":  the definition applies to third parties only "to the extent that any such person or entity is seeking relief on behalf of or generally applicable to the general public * * *, as opposed solely to private or individual relief for separate and distinct injuries."  By the plain terms of that definition, the Williams estate is not a "Releasing Party."  When the estate sued Philip Morris, the estate did not "seek[] relief on behalf of or generally applicable to the general public."  Nor could it.  As noted above, the United States Supreme Court has held that punitive damages may not be awarded to punish a defendant for harms to persons who were not parties to the litigation.  ___ Or at ___ n 11 (slip op at 17 n 11).  Rather, in its effort to recover damages for injuries suffered by Jesse Williams, the estate was seeking "private or individual relief" for the death of Jesse Williams, a "separate and distinct injur[y]."

Moreover, as we pointed out earlier in this opinion, Philip Morris's contention that this court, in *DeMendoza*, held that a plaintiff never has an interest in the 60 percent of a punitive damages award that is allocated to the state under ORS 31.735 is simply incorrect.  The court held in *DeMendoza* that a plaintiff does not have a constitutionally vested right to punitive damages before judgment, because the jury ultimately has discretion not to award punitive damages.  334 Or at 449.  However, the fact that a plaintiff does not have a constitutionally guaranteed expectation of punitive damages does not mean that a plaintiff never has any interest in the entirety of a punitive damages award.  As we discuss above, the estate had a significant interest in that award.  As this court explained in *Patton*, before a judgment is entered awarding punitive damages, a plaintiff has the right to control the punitive damages claim, including the

21

right to settle away the state's 60 percent statutory share. 349 Or at 243-44. Thus, we cannot conclude that the Williams estate sued Philip Morris on behalf of the public for the share of the punitive damages award that would inure to the public's benefit after entry of the judgment.[12] The Williams estate is not a "Releasing Party" under the MSA.

Finally, Philip Morris argues that, if this court concludes that the state did not release its statutory interest in the *Williams* punitive damages award when it executed the MSA, then the court must conclude that the MSA is ambiguous, because Philip Morris's construction of the MSA's release terms to cover the state's entitlement to part of the punitive damages award is plausible. Therefore, according to Philip Morris, this court should remand the case for factfinding to resolve the ambiguity. *See Pacific First Bank*, 319 Or at 348 (a contract is ambiguous if it can reasonably be construed to have more than one meaning).

We disagree that the MSA contains an ambiguity that must be resolved. Our conclusion that the state's interest in its statutory share of the punitive damages award is not covered under the MSA is not based on our construction of any ambiguous terms of the MSA, but on our interpretation of the statute that confers the state's share. That is, we have examined the nature of the state's interest under ORS 31.735, and we conclude, as a matter of law, that that interest is *not* directly or indirectly based on,

---

[12]    The Williams estate also points out that it sued Philip Morris in 1997, five years before this court resolved the constitutional challenges to ORS 31.735 in *DeMendoza*, and it consistently argued to the trial court that ORS 31.735 was unconstitutional and that it was entitled to the entire punitive damages award.

22

arising out of, or related in any way to the conduct that formed the basis for the estate's claims in *Williams*. Rather, as discussed at length above, the state's interest arises by operation of law in any case in which punitive damages are awarded, without regard to the nature of the underlying litigation. We understand Philip Morris's construction of the term "Released Claims" to include any entitlement to payment that is "'indirectly based on, arising out of or in any way related, in whole or in part, to' the conduct that that formed the basis of the claims in *Williams*." Accepting that construction as correct for purposes of analysis here, we nevertheless conclude that the state's interest in 60 percent of the punitive damages award in *Williams* is not a "Released Claim" for tobacco-related conduct under the MSA, and that the state did not release its right to that share of the punitive damages award in that case when it executed the MSA.

The judgment of the circuit court in *Williams v. Philip Morris* (CC970503957) is reversed, and the case is remanded for entry of a judgment consistent with this opinion. The post-judgment order in *State v. American Tobacco Co.* (CC 970604457) is reversed.

23