

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-13-00037-CV

FRONTIER COMMUNICATIONS
NORTHWEST, INC.
APPELLANT

V.

D.R. HORTON, INC.; D.R. HORTON
LOS ANGELES HOLDING
COMPANY, INC.; WESTERN
PACIFIC HOUSING, INC.; SSHI,
LLC; AND D.R. HORTON, INC. -
PORTLAND
APPELLEES

----------

### FROM THE 236TH DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 236-253829-11

----------

## MEMORANDUM OPINION[1]

----------

This dispute involves commissions paid by a telephone-and-broadband-communications provider to a homebuilder under a contract. The trial court

---

[1]*See* Tex. R. App. P. 47.4.

granted summary judgment for the homebuilder, Appellees D.R. Horton, Inc., D.R. Horton Los Angeles Holding Company, Inc., Western Pacific Housing, Inc., SSHI LLC, and D.R. Horton, Inc.-Portland (collectively, DRH), on Appellant Frontier Communications Northwest Inc. (FCN)'s breach-of-contract, tort, and attorneys' fees claims.[2]  FCN appeals the trial court's summary judgment on its breach-of-contract claim, complaining in its first issue that the trial court erred by determining that it lacked standing to sue DRH.[3]

We review a summary judgment de novo.  *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).  We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not.  *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).  We indulge every reasonable inference and resolve any doubts in the nonmovant's favor.  *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).

---

[2]The trial court also denied FCN's claim for declaratory relief as to the recovery of any amounts DRH had already received under the contract but granted the claim to the extent that DRH would be precluded from recovering from FCN on any unpaid request for payment of commissions submitted under the contract.

[3]FCN's remaining issues pertain to the breach-of-contract claim, DRH's affirmative defenses, and FCN's objections to the affidavit testimony of Gina White, one of DRH's witnesses.  FCN does not appeal the trial court's summary judgment on its tort claims.

2

As one of the grounds in its summary judgment motion, DRH argued that FCN had no standing because FCN was not a party to the contract, the contract could not be assigned to it, it was an unauthorized assignee of Verizon, and the assignment FCN relied upon was unenforceable.[4] Standing, a necessary component of subject-matter jurisdiction, is a constitutional prerequisite to maintaining suit. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444–45 (Tex. 1993). Whether a party has standing to pursue a claim is a question of law reviewed de novo. *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998), *cert. denied*, 526 U.S. 1144 (1999). To establish standing to assert a breach of contract cause of action, a party must prove its privity to the agreement or that it is a third-party beneficiary or assignee. *Maddox v. Vantage Energy, LLC*, 361 S.W.3d 752, 756–57 (Tex. App.—Fort Worth 2012, pet. denied); *Rolen v. LVNV Funding, LLC*, No. 02-09-00304-CV, 2010 WL 1633402, at *2 (Tex. App.—Fort Worth Apr. 22, 2010, no pet.) (mem. op.); *see also Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 420 (Tex. 2000) (stating that the assignee stands in its assignor's shoes and may assert only those rights

---

[4]In its original and subsequent pleadings, FCN alleged that it had acquired the contract as a successor-in-interest and mentions assignment. In response to DRH's summary judgment motion, FCN stated that it was renamed and claimed that no assignment was necessary but also that Verizon transferred the breach-of-contract cause of action to it. FCN also claimed in its motion for partial summary judgment that no assignment was necessary because it was a party to the contract. In its response to FCN's motion for partial summary judgment, DRH stated that "the efforts to assign the claims to [FCN] are invalid and unenforceable and . . . [FCN's] claims fail on that basis alone."

that the assignor could assert). As the contract includes a choice-of-law clause establishing that it "shall be interpreted and governed by the laws of the state where the Property is situated," and the property at issue here is situated in Oregon and Washington, we must construe the contract under the law in these jurisdictions.

The primary objective in contract interpretation in both states is determining the drafter's intent. *Wilkinson v. Chiwawa Cmties. Ass'n*, 327 P.3d 614, 619 (Wash. 2014); *see also James v. Clackamas Cnty.*, 299 P.3d 526, 532 (Or. 2013) ("In interpreting a contract, we seek to implement the intent of the parties to the contract by considering the contract terms in their context."). Under Washington law, extrinsic evidence is used to illuminate what was written, but evidence that would vary, contradict, or modify the written word or show an intention independent of the instrument will not be considered. *Wilkinson*, 327 P.3d at 619; *Berg v. Hudesman*, 801 P.2d 222, 229 (Wash. 1990) ("We now hold that extrinsic evidence is admissible as to the entire circumstances under which the contract was made, as an aid in ascertaining the parties' intent."). Additionally, "[i]n discerning the parties' intent, subsequent conduct of the contracting parties may be of aid, and the reasonableness of the parties' respective interpretations may also be a factor in interpreting a written contract." *Berg*, 801 P.2d at 229.

Under Oregon law, in contrast, other evidence of the parties' intent is not considered unless a provision of the contract is ambiguous. *Williams v. RJ*

*Reynolds Tobacco Co.*, 271 P.3d 103, 109 (Or. 2011). That is, in Oregon, the court first examines the text of the disputed provision in the context of the document as a whole; if the provision is clear, the analysis ends. *Yogman v. Parrott*, 937 P.2d 1019, 1021 (Or. 1997). If the provision is ambiguous, then the court examines extrinsic evidence of the contracting parties' intent, including the parties' practical construction of the agreement. *Id.* at 1022. If the meaning of the contractual provision remains ambiguous, the court then relies on appropriate maxims of construction. *Id.*

We must determine whether the contract identifies FCN as a party. *See, e.g.*, *Sherwood Park Bus. Ctr., LLC v. Taggart*, No. CO85540CV; A150753, 2014 WL 6693829, at *10 (Or. Ct. App. Nov. 26, 2014) (noting that the operating agreement listed as parties the original members and any other persons admitted as members under the agreement's terms); *Brummett v. Wash.'s Lottery*, 288 P.3d 48, 55 (Wash. Ct. App. 2012, review denied) (holding that appellant could not assert a contract claim "because he was neither a party to the contract nor an intended third party beneficiary").[5]

---

[5]DRH argues that FCN was an incidental beneficiary and therefore not entitled to directly enforce the contract under either Oregon or Washington law. We do not reach this argument because FCN did not plead that it was a third-party beneficiary; in its live pleading, FCN claimed that it was a successor-in-interest, and in its response to DRH's motion for summary judgment, FCN argued that it had standing as a party to the contract and because Verizon had assigned its breach-of-contract cause of action to FCN through an assignment and assumption agreement.

The contract provides:

> This Contract for Marketing of Services (the "Contract") is made and entered into as of January 8, 2008 (the "Effective Date"), by and between *Verizon Services Corp., having an office for the purposes of this Agreement at One Verizon Way, Basking Ridge, New Jersey 07920 on behalf of its affiliated service provider companies listed in Exhibit A (collectively referred to as the "Company" or "Verizon"*) and D.R. Horton Los Angeles Holding Company, Inc., having its principal office at 2280 Wardlow Circle, Suite 100, Corona, CA 92880 (the "Developer").
>
> **WHEREAS**, Company, *through its affiliated operating companies listed in Exhibit "A,"* desires to market, and provide certain local exchange and long distance residential telephone services, high-speed Internet access where available, and video services (the "Services"), that it offers to its residential telephone customers within the service area of the Covered Properties (defined below); and
>
> **WHEREAS**, Developer owns or controls, by option to purchase or otherwise, subdivision projects listed in Exhibit C (the "Covered Property" or "Covered Properties") *in the territories served by the Company* and desires to make the Covered Properties available to the Company to construct its telecommunications facilities for the purpose of serving occupants of single family residences, and condominiums, townhomes and multiple dwelling units ("Residents"); and
>
> **WHEREAS**, Company wishes to secure Developer's cooperation in the marketing of the Services to buyers (the "Buyers["] or "Residents") of single family homes, condominiums or town homes ("Home" or "Homes") constructed by Developer at Developer's Covered Properties under the terms contained herein[];
>
> NOW THEREFORE, *Company and Developer (singular the "Party", collectively the "Parties")* agree as follows . . . . [Emphasis added.]

Verizon Northwest Inc. was listed in Exhibit A, entitled "Verizon Telephone Companies," along with Verizon Services Corp. and fifteen other entities. FCN

produced evidence that its previous name had been Verizon Northwest Inc., and the trial court took judicial notice of this evidence. Therefore, we must consider the rest of the contract's terms to determine whether Verizon Service Corp.'s entering the contract "on behalf of" the affiliated service provider companies and making a collective reference to them in the contract's preamble made the individual affiliated service companies parties to the agreement.

Section 2, "Covered Properties," states that the properties covered by the agreement

> shall be identified from time to time during the Contract Term through the completion of a separate Covered Property addendum, a sample of which is set forth as "Exhibit C," for each property. The inclusion of each property *is subject to mutual agreement between Developer and Company* prior to inclusion as a Covered Property. . . . Developer shall not include lots within subdivisions that are not within the Company's franchise service area. Company may also exclude a property if there are pre-existing contractual obligations under a marketing agreement with another party, such as a master planned community developer.[6] [Emphasis added.]

Section 4, entitled, "Company's Obligations," covers services, technology, marketing program, and commission payments. Section 4.1 states,

> Company will provide the Services to the Residents in accordance with the telecommunications technology that is available to the Residents from the Company Central Office ("CO") that serves the Residents of each Covered Property. *Any new Company Services developed and approved by Company for payment of commissions*, which become available to Residents from the CO during the Contract Term hereof, will then become a part of the

---

[6]Section 1 addresses the contract's duration. Section 3 pertains to DRH's duty to act exclusively "on behalf of Company" regarding placement of marketing materials at each Covered Property.

7

Services hereunder. All Services provided to the Property shall be in accordance with all applicable laws, regulations and tariffs. Company will provide the sales personnel and processes through its established call centers to adequately support the timely and effective signup of Residents for the Services when and as requested by Residents.

. . . .

Company shall be solely responsible for billing the Residents for the Services. . . . [Emphasis added.]

Section 4.2, "Marketing Program," states that "Company will implement, at its sole cost," the marketing program and "will provide Developer's staff with appropriate promotional material(s). . . ." It further states,

Training requirements and procedures, if any, for Developer's staff and all marketing and promotional plans, schedules and activities *shall be determined by Company*, with input from Developer, and subject to Developer's reasonable approval. Company shall not provide promotional materials or train Developer's staff, nor shall Developer request such materials, until the Parties have signed this Contract. [Emphasis added.]

Section 4.3, "Commission Payments," states, "Company" will pay a one-time commission payment of $225 per "Home passed" at each Covered Property. "To initiate the Commission Payments, *Developer will submit to the Company*, by the 10th day of each month, a summary report (the "Closed Homes Report"). . . . Remittance of the Commission Payments by the Company . . . will be made within thirty (30) days following receipt of the Closed Homes Report . . . ."

Section 5 covers the developer's obligations, including that it "permit employees, agents, or contractors of Company" reasonable access to each Covered Property to market services, a right of access that would survive the

8

contract "for as long as Company owns telecommunications facilities and equipment on the Covered Property or so long as this Contract is not terminated." It provides, "Company is, and shall continue to be, the sole and exclusive owner of said telecommunications facilities." Section 5.2 requires the developer to provide "to Company a summary list of property addresses for each Covered Property, in the form of the Property Address List, attached as Exhibit F."

Section 6 covers "Terms and Conditions," including the attorneys' fees, governing law, force majeure, and limitations of liability clauses. Section 6.1 provides in pertinent part here that "either party shall have the right to assign this Agreement *to an affiliate* without consent." [Emphasis added.] Section 6.8, "Indemnification," provides,

> Each Party agrees to indemnify, defend, and hold harmless the other Party (including its officers, directors, principals, assigns, successors, *affiliates*, agents, and employees) from and against any and all liability, loss, damage, claim or expense . . . incurred by the other Party in connection with: (a) any claim, demand, or suit for damages, injunction or other relief to the extent it is caused by or results from the negligence, gross negligence, or intentional misconduct (including, without limitation, breach or nonperformance of this or any contract) of the indemnifying party (including any of its agents, or subcontractors); and (b) any actual or alleged infringement of any third party's trade secrets, trademark, copyright, patent or other intellectual property rights by the indemnifying Party . . . . [Emphasis added.]

Section 6.10 provides that each "Party" agrees to maintain as a minimum at all times during the contract term commercial general liability insurance with

9

minimum limits of $1,000,000 per occurrence for bodily injury or death and property damage liability.

Section 6.11 provides that "Company" shall not be liable to the developer for interruption of service and "Company's" liability, if any, to residents that are its customers "will be governed exclusively in the case of regulated services by Company's applicable tariffs filed with the appropriate state regulatory agency, or in the case of non-regulated services by the applicable contract with the Resident."

Section 6.14, "Notices and Payments," states that delivery of all notices, demands, and invoices for payments should be sent to Verizon Enhanced Communities at a Virginia address, "Payments Attention: Contract Manager," with a verizon.com email address. All other notices were to be sent to Verizon Enhanced Communities at the same Basking Ridge, New Jersey address listed in the contract's preamble, with a verizon.com email address.

Section 6.15, "Publicity/Trademark Licenses," provides that "Neither Party may use the other Party's name, trademarks, trade names *or the name of any affiliate or subsidiary of the other* . . . without such other's prior written consent." [Emphasis added.]

Section 6.16, "Regulatory Approvals," includes the following:

> All regulated services are provided in accordance with applicable laws, tariffs and regulations, and this Contract shall at all times be construed to be consistent with those laws, tariffs and regulations. In the event this Contract or any of the provisions herein, or the operations contemplated, are found by Company to be

10

inconsistent with or contrary to any such law, tariff or regulation, that law, tariff or regulation shall be deemed to control and, if commercially practicable, this Contract shall be regarded as modified accordingly, and shall continue in full force and effect as so modified. If such modified Contract is not commercially practicable in the opinion of either Party in its sole discretion, the Parties agree to meet promptly and discuss any necessary amendments or modifications to this Contract. If the parties are unable to agree on necessary amendments or modifications in order to comply with the law, tariff or regulation, then either Party may terminate this Contract by giving ninety (90) days written notice to the other Party.

Developer acknowledges that the Company is regulated by the Federal Communications Commission and appropriate state public service commissions. In the event of a change in the laws, rules, regulations or tariffs applicable to the Company's services under this Contract, which change results in a conflict with any of the terms, covenants and conditions of this Contract, such laws, rules, regulations and tariffs shall control.

Section 6.19 provides that the contract, "including any and all appendices hereto," constitutes the entire agreement. The contract was signed by a Verizon Services Corp. sales director and a D.R. Horton Los Angeles Holding Company, Inc. vice president.

As stated above, Exhibit A, "Verizon Telephone Companies," lists Verizon Northwest Inc., in addition to Verizon Services Corp., Verizon California Inc., Verizon Delaware Inc., Verizon Southwest Inc., Verizon Maryland Inc., Verizon New England Inc., Verizon New Jersey Inc., Verizon New York Inc., Verizon North Inc., Verizon Online, Verizon Pennsylvania Inc., Verizon South Inc., Verizon Washington, DC Inc., Verizon West Coast Inc., Verizon West Virginia Inc., and Verizon Virginia Inc.

Exhibit C, describing "Covered Property," states in its first paragraph:

> WHEREAS *Verizon Services Corp. ("Company")* and D.R. Horton Los Angeles Holding Company, Inc. ("Developer") have entered into a CONTRACT FOR MARKETING OF SERVICES to buyers (the "Buyers" or "Residents") of single family homes, condominiums or town homes ("Home" or "Homes"), constructed by Developer or Developer's builders (the "Builders") (the "Contract") previously executed as of January 8, 2008. [Emphasis added.]

Exhibit D sets out the marketing program. Exhibits E and F set out the format for the closed home report and property address list. Exhibit G sets out residential wiring specifications.

Taken as a whole, based on its plain language under either Washington or Oregon law, it is apparent that the contract's overall intent was for Verizon Services Corp. to enter the agreement as "Company" on behalf of its affiliated service provider companies, retaining the authority to coordinate and control the company's marketing materials, overall interactions with DRH, and payment of invoices, not to make each of the "Verizon Telephone Companies" listed in Exhibit A into a separate party to the contract.

Under Washington law, this interpretation is supported by the parties' conduct after the contract's formation. *See Wilkinson*, 327 P.3d at 619; *Berg*, 801 P.2d at 229. FCN attached to its motion for partial summary judgment DRH's responses to interrogatories, which included DRH's admission that it received checks from Verizon on December 18, 2009 ($236,250), January 21, 2010 ($153,225), and March 18, 2010 ($482,850). DRH attached copies of these checks to its motion for summary judgment, which show that the checks were written by "Verizon Services Corp."

12

FCN also attached excerpts of Gina White's deposition, in which White explained that she had to print an address list and "submit it to Verizon on their form for submission" to process DRH's requests for commissions; she did not mention sending any forms to any of the affiliates, and the record does not contain any such documentation involving the affiliates.[7]

On January 20, 2011, Verizon sent DRH a letter regarding the January 8, 2008 contract (referred to as "the Agreement" in the letter), stating,

> On July 1, 2010, Verizon Communications Inc. ("Verizon"), the ultimate parent corporation *to the entity that is a party to the Agreement*, transferred to Frontier Northwest Inc. ("Frontier Northwest"), then a subsidiary of Verizon, but now a subsidiary of Frontier Communications Corporation ("Frontier"), its local exchange business in Oregon and Washington as well as certain assets, liabilities and contracts as they relate to services in Oregon and Washington (the "Transferred Service Territories"), herein referred to as the "Transaction[.]"

> Verizon has withdrawn its authority as a local exchange carrier in Transferred Service Territories. Frontier Northwest is the authorized local exchange carrier in the Transferred Service Territories and Verizon local exchange carriers no longer have regulatory authority to provide local exchange services in the Transferred Service Territories.

> *Under the Agreement Verizon or its affiliate* agreed to provide certain services and/or products in the Transferred Service Territories ("Services") as well as in at least one other state not involved in the Transaction.

---

[7]White submitted her information to Andrea Werker at Verizon. Werker worked for Verizon as a contract manager until July 2010, when she started working for Frontier. Werker's emails to White from Verizon include her title as "Verizon Enhanced Communities Contract Management," with a verizon.com email address.

In connection with the Transaction, Verizon desires to assign to Frontier Northwest all of its rights and obligations in respect of the Services provided in the Transferred Service Territories only. Verizon will continue to provide the Services on the terms and conditions set forth in the Agreement in all other states covered by the Agreement, excluding the Transferred Service Territories.

Verizon requests that your organization consent to the partial assignment of the Agreement in respect of the Transferred Service Territories to Frontier Northwest. Your consent means that you agree that the assigned portion of Agreement services in the Transferred Service Territories will continue in force and effect in accordance with its rates, terms and conditions, to be retroactively effective as of July 1, 2010, between your organization and an affiliate of Frontier. The unassigned portion of the Agreement for services in all locations other than the Transferred Service Territories will continue in force and effect in accordance with its rates, terms and conditions between your organization and Verizon or its affiliate.

We would appreciate your execution and return of these documents to the address below no later than February 11, 2011.

. . . .

CONSENT FOR PARTIAL ASSIGNMENT

The undersigned as an authorized representative of D.R. HORTON LOS ANGELES HOLDING COMPANY, INC. hereby consents to Verizon's partial assignment of the Agreement in respect of Services provided in the Transferred Service Territories only, to Frontier Northwest Inc., as described herein to be retroactively effective July 1, 2010.[8] [Emphasis added.]

---

[8]On May 26, 2011, Verizon sent DRH another letter, stating,

The transaction between Verizon and Frontier closed on July 1, 2010.

A review of our records indicates that Verizon has not received your company's response to the attached letter [a copy of the January 20, 2011 letter] requesting consent for contract assignment. We would

14

None of the evidence attached by either party shows any separate interactions between DRH and Verizon Northwest Inc. Applying the law of either Oregon or Washington, we reach the same conclusion—Verizon Northwest Inc. was not, by itself, a party to the agreement. We overrule this portion of FCN's first issue and turn to its remaining argument that it had standing because Verizon assigned the breach-of-contract cause of action to it.

FCN included the January 2011 assignment and assumption agreement between Verizon and "Frontier Northwest, Inc., a Washington corporation" in its summary judgment evidence. FCN relies on this document to support its argument that the breach-of-contract cause of action was assigned to it, even if the anti-assignment clause in the contract itself would otherwise have prevented its standing.[9]

---

appreciate your execution and return of the attached letter no later than June 17, 2011.

We will be attempting to contact you to answer any questions you may have, or you may contact the Verizon representative outlined in the attached letter.

Thank you for your timely response.

David T. Morice, a D.R. Horton, Inc. vice president and legal counsel for it and its subsidiaries, stated in his affidavit, which sponsored the letters, that no one on behalf of any D.R. Horton entity signed the consent for partial assignment.

[9]The anti-assignment clause in section 6.1 of the January 8, 2008 contract between Verizon and DRH provided, in pertinent part,

Except as provided above [regarding DRH's ability to assign its rights and obligations to a third-party purchaser that was not a DRH

15

The first clause of the assignment and assumption agreement provides,

(i) Effective as of the consummation of the Merger on July 1, 2010, Assignor hereby bargains, sells, grants, assigns, transfers, conveys and delivers unto Assignee, and its successors and assigns, forever, all of Assignor's right, title and interest in and to the Agreements set forth on Exhibit A hereto, but only to the extent that such right, title and interest is applicable to the Territory (the "Assigned Agreements") TO HAVE AND TO HOLD such Assigned Agreements with all appurtenances thereto, for their use forever and (ii) in full consideration for the Assigned Agreements, Assignee shall assume the rights and obligations of Assignor pursuant to the Assigned Agreements.

The agreement provides that it is governed by and construed in accordance with New York law. Exhibit A refers to the January 8, 2008 contract between Verizon and DRH.

An assignment is simply a transfer of some right or interest. *1 Lincoln Fin. Co. v. Am. Fam. Life Assur. Co. of Columbus*, No. 02-12-00516-CV, 2014 WL 4938001, at *4 (Tex. App.—Fort Worth Oct. 2, 2014, no pet.) (mem. op.). When an assignee holds a contractually valid assignment, that assignee steps into the shoes of the assignor and may assert those rights that the assignor could assert. *Id.* However, to recover on an assigned cause of action, the party claiming the

---

affiliate or to a subsequent owner all or a portion of a particular covered property], *neither party shall assign or sublicense its interest in this Agreement without the express prior written consent of the other party, except that either party shall have the right to assign this Agreement to an affiliate without consent.* [Emphasis added.]

We note that per this provision's plain language, if Verizon Services Corp. had assigned the contract to Verizon Northwest Inc. *before* the merger, it would not have needed DRH's consent to the assignment.

assigned right must prove not only that a cause of action existed that was capable of assignment but also that the cause was in fact assigned to the party seeking recovery. *Geis v. Colina Del Rio, LP*, 362 S.W.3d 100, 117 (Tex. App.—San Antonio 2011, pet. denied) (op. on reh'g).

Here, Verizon attempted to assign its interest in the agreement with DRH to FCN but actually assigned it to "Frontier Northwest, Inc., a Washington corporation." At FCN's request, the trial court took judicial notice that it had changed its name from Verizon Northwest Inc. to Frontier Communications Northwest Inc., and in its appellate brief, FCN concedes that there is another Washington corporation with the name Frontier Northwest, Inc. and that the existence of this other company required Frontier's parent entity to rename Verizon Northwest Inc. to Frontier Communications Northwest Inc. FCN nonetheless argues in its reply brief that New York law, which governs the assignment and assumption agreement, disregards misnomers, resulting in a valid assignment of the breach of contract action to it despite the plain language purporting to assign everything in the DRH-Verizon contract to "Frontier Northwest Inc., a Washington corporation."

While the assignment agreement is governed by New York law as to disputes between the assignor and assignee, we review its validity under Texas law for purposes of standing to bring suit here against a nonsignatory to the

17

assignment contract.[10]  FCN proved through the attachment of the assignment agreement that all rights in the DRH-Verizon contract had been assigned to a third party that was not FCN, which was insufficient to show that FCN had standing to bring suit on the January 8, 2008 contract.[11]  Therefore, we overrule the remainder of FCN's first issue, affirm the trial court's judgment, and do not reach the remainder of FCN's issues.  *See* Tex. R. App. P. 47.1.

/s/ Bob McCoy

BOB MCCOY
JUSTICE

PANEL:  DAUPHINOT, MCCOY, AND GABRIEL, JJ.

DELIVERED:  December 31, 2014

---

[10]In contrast, the validity of the anti-assignment clause would be governed by Washington and Oregon law.  Because FCN argues that a cause of action for breach of contract, not the contract itself, was assigned, we need not consider the anti-assignment clause's validity.

[11]In a footnote in the fact statement of its appellate brief, FCN states that Verizon Services Corp. acted as an agent of Verizon Northwest Inc. in entering the January 8, 2008 contract, but nothing in the record shows that Verizon Services Corp. was subject to its affiliate's control, and FCN did not brief this argument.  *See* Tex. R. App. P. 38.1(i); *see also Eads v. Borman*, 277 P.3d 503, 508 (Or. 2012) (stating that an agency relationship results from the "manifestation of consent by one person to another that the other shall act on behalf and subject to his control, and consent by the other so to act."); *Moss v. Vadman*, 463 P.2d 159, 164 (Wash. 1969) ("We have repeatedly held that a prerequisite of an agency is control of the agent by the principal.").