LEE PACIFIC PROPERTIES, INC.;
Howard Liebreich, an individual;
ND Manor, LLC;
Greenwood Manor Oregon, LTD.;
Surfwood Manor Oregon, LTD.; and
Rockwood-Caldwell Oregon, LTD.,
*Plaintiffs-Appellants*
*Cross-Respondents,*

*v.*

CENTURY PACIFIC EQUITY CORPORATION;
Greenwood Housing Limited Partnership;
Surfwood Limited Partnership,
aka Surfwood Housing Limited Partnership;
Firwood Housing Properties, LTD.,
aka Firwood Limited Partnership;
Pinewood Investments, LTD.;
Clearwater Limited Partnership;
Burnwood Housing Limited Partnership,
aka Burnwood Limited Partnership;
Ochoco Housing Limited Partnership;
Indiana Housing, LTD.,
aka Indiana Manor Limited Partnership,
*Defendants-Respondents*
*Cross-Appellants,*
*and*

Irwin J. DEUTCH,
an individual;
Michaels Development Company;
Oregon Housing Fund-I, LTD.;
Northwestern Housing Fund-I, LTD.;
Wilshire Investments Corporation;
Western Housing Associates, LTD.;
Louis A. Cicalese; Jasper Corporation;
Rolling West Housing Partners;
CP Investment Fund 85-I, LTD.;

AFC Corporation; American Pacific Housing Corporation, fka Century Pacific Housing Corporation; and Managements Assistance Group, Inc., *Defendants-Respondents,*

*and*

AFC CAPITAL FUND
and AFC Capital Corporation,
*Defendants.*

Multnomah County Circuit Court
090202097; A149351

356 P3d 1137

Richard S. Yugler argued the cause for appellants-cross-respondents. With him on the opening brief was Landye Bennett Blumstein LLP. With him on the cross-respondents' answering brief and appellants' reply brief were Christine N. Moore and Landye Bennett Blumstein LLP.

George W. Kelly argued the cause and filed the briefs for respondents-cross-appellants.

George W. Kelly waived appearance for defendants-respondents.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

GARRETT, J.

**GARRETT, J.**

This appeal pertains to the interpretation of a settlement agreement. The subject of the agreement was the parties' interests and obligations in certain limited partnerships that owned low-income housing projects insured by the Department of Housing and Urban Development (HUD), as well as their interests and obligations in the housing projects themselves. Plaintiffs brought suit, claiming that defendants had breached certain terms of the settlement agreement; defendants counterclaimed that plaintiffs had also breached the settlement agreement. The main issue in both the claims and counterclaims is whether plaintiffs, who held security interests in the limited partnerships that owned the properties, were required under the settlement agreement to submit "Transfer of Physical Assets" (TPA) documents to HUD in order to manage and control the housing projects.

The trial court, after bifurcating the legal claims from the equitable claims and trying the equitable claims and counterclaims for declaratory relief and specific performance, declared that the settlement agreement did not unconditionally require plaintiffs to submit TPAs. The trial court further declared that defendants did not breach the settlement agreement when they revoked plaintiffs' management and control of the properties. Based on its conclusions, the trial court entered judgment granting two of plaintiffs' three claims, and denying all three of defendants' counterclaims. We affirm in part and reverse in part.

## I.  FACTS

Because this is an equitable case, the Court of Appeals, "acting in its sole discretion, may try the cause anew upon the record or make one or more factual findings anew upon the record." ORS 19.415(3)(b). No party has requested that we exercise our discretion to review *de novo*. Nevertheless, as explained below, 272 Or App at 635, the trial court's interpretation of the parties' settlement agreement was partially erroneous, and, as a result, the court did not expressly resolve a necessary factual dispute. That dispute concerns the position that HUD took regarding the

requirement (or not) that TPAs be submitted. As explained below, 272 Or App at 635, because that factual dispute can be resolved only one way on the existing record, rather than remand, we exercise our discretion to engage in *de novo* review and make the necessary finding. Except for the finding that we have made *de novo, see* 272 Or App at 635, we state the remaining facts—which are supported by evidence in the record—consistently with the trial court's explicit and implicit findings and review the court's legal conclusions for legal error. *Neff v. Sandtrax, Inc.*, 243 Or App 485, 487, 259 P3d 985, *rev den*, 350 Or 716 (2011).

A.  *History of transactions pertaining to the eight housing projects*

The eight housing projects that are at the core of the disputed settlement agreement were developed in the 1970s by Jack Miller. For each project, Miller created a limited partnership to hold title in the project. HUD either financed or insured the financing of each project. Consequently, each project was subject to a promissory note (HUD note), each was subject to a mortgage (HUD mortgage), and each was subject to a regulatory agreement between HUD and the property-owning partnership.

The regulatory agreement gave HUD extensive regulatory authority over the operation and maintenance of the project. Significant to the issues in this action was the following provision in the regulatory agreement:

"The sponsor [property owner] may perform * * * the following acts only *with the prior written approval of [HUD:]*

"Convey, transfer or encumber any of the development property;

"Assign, transfer * * * or encumber any personal property of the [d]evelopment, including rents;

"*Convey, assign * * * or permit the surrender of * * * any right to manage* or receive the rents and profits of the [d]evelopment[.]*"

(Emphasis added.)

In 1984, the original property-owning partnerships sold each of the properties to other limited partnerships, each

of which was controlled by Century Pacific Equity Corporation (Century Pacific).[1] Each buying partnership financed part of the purchase of its housing project through a loan from the selling partnership. Because the properties were subject to existing HUD notes, HUD mortgages, and HUD regulatory agreements, each selling partnership (seller/creditor) was prohibited from securing its loan to the buying partnership (buyer/debtor) with a lien on the property. Instead, each buyer/debtor executed an "All-Inclusive Residual Note and Agreement" (wrap note), in which each agreed to grant the seller/creditor "collateral" that the wrap note defined as "all the right, title and interest of the [buyers/debtors] as either general or limited partners of [the buying partnership]." Each sale also included an agreement of sale and a security agreement that granted the seller/creditor a security interest "in and of the collateral," and allowed the seller/creditor to foreclose on the partnership interests upon failure of the buyer/debtor to pay its loan debt to the seller/creditor.[2] Thus, the seller/creditor partnership secured its loan not in the property, but in the respective partners' interests in the buyer/debtor partnership that owned the property.

The wrap note also contained a unique provision, in that it reserved, in each seller/creditor, "the sole and exclusive right to select, from time to time, the managing agent or agents for the Project subject only to the prior approval of [HUD] of such agent or agents, *if required.*" (Emphasis added.) The evidence does not indicate whether HUD was aware of this provision in the wrap note, let alone whether it approved of its effect. Nevertheless, this provision would become a key provision in the wrap note, would eventually affect HUD's dealings with the property-owning partnerships and wrap note-holding partnerships, and would lead to the current dispute.

---

[1] The partnerships were initially controlled by two general partners, Wilshire Investments Corporation and Century Pacific, but eventually Century Pacific became the sole general and managing partner of the limited partnerships owning the eight housing projects.

[2] Waller Taylor, an expert on HUD transactions, testified at trial that, prior to 1986, HUD-insured properties were often "syndicated" to entities such as limited partnerships in order to maximize tax benefits for the partners in these partnerships. Wrap notes were one of the mechanisms commonly used for the financing of such transactions.

Plaintiff Lee Pacific Properties, Inc. (Lee Pacific) acquired its interests in the properties a few years after the sale of the housing projects, when Jack Miller, the general partner for the selling partnerships, filed for bankruptcy. Howard Liebreich, the managing partner of Lee Pacific, purchased Miller's general and limited partner rights from the 1984 sale of the eight projects, including all of the partner rights in the agreements of sale, the wrap notes, and the security agreements. Lee Pacific thus became the general managing partner of all of the limited partnerships holding notes on the property-owning partnerships that were and are controlled by Century Pacific. Consequently, we hereafter refer to the note-holding and property-owning partnerships, respectively, as Lee Pacific and Century Pacific.

Initially, the relationship between Lee Pacific and Century Pacific appeared to run smoothly. Lee Pacific, acting through Liebreich and exercising its right under the wrap note provision, directed the management of the properties. Among other things, Liebreich contracted with a company called Guardian Management to be the property manager for all eight properties.

In 1992, Irwin Deutch, the managing partner and director of Century Pacific, contacted Liebreich about the possibility of extending the wrap notes, which were to mature in 1994. The trial court found that for the next few years, Deutch and Liebreich discussed extending the maturity dates on the wrap notes, although no formal agreement extending the notes was ever executed. The parties knew that any extension past 1999 would lead to unfavorable tax consequences to Lee Pacific. Consequently, in 2000, Lee Pacific notified Century Pacific that the notes were in default, and when payment on the notes was not forthcoming, Lee Pacific brought suit against Century Pacific.

B. *The 2000 lawsuit*

In the amended complaint filed in the 2000 litigation, Lee Pacific alleged that it had notified Century Pacific that, as to each property, "in exercise of the authority provided in the Security Agreement, and based on default in the payment of the [wrap note,] [Lee Pacific] assumed

exclusive control of the right and privileges * * * in the Collateral, and * * * effective immediately, [Lee Pacific] assumed exclusive power to control [Century Pacific] and its property." Lee Pacific sought a declaratory judgment, requesting the court to declare that, as to each property, Lee Pacific was "entitled to take control of the partnership rights in [Century Pacific] * * *, and that [Lee Pacific's] rights are superior to any rights or interests of [any partner] in the collateral and assets of [Century Pacific], to the extent of the unpaid balance of the [wrap notes]." Lee Pacific also sought a preliminary and permanent injunction prohibiting Century Pacific "from interfering with [Lee Pacific's] control of the Collateral and specifically from taking any action purporting to be an action of [Century Pacific] or authorized by [Century Pacific] or affecting the rights or assets of [Century Pacific], without express authorization by [Lee Pacific], until full payment of the [wrap notes]."

The record indicates that, initially, the parties continued to act as they always had in relation to the properties, with Lee Pacific continuing to oversee Guardian Management's management of the properties. Eventually, though, a dispute arose between Century Pacific and Lee Pacific about Lee Pacific's continued oversight of Guardian Management, and Century Pacific attempted to terminate Guardian Management's contracts with the properties. Lee Pacific moved for a temporary restraining order against Century Pacific and a preliminary injunction, and on March 28, 2001, the court entered an order indicating that, by agreement of the parties, Guardian Management would remain the property manager of the projects pending further order of the court, and that no party would interfere with Guardian Management's day-to-day management of the projects.

On June 27, 2002, Deutch wrote to Liebreich offering to transfer and assign all of the partnership interests in each of the properties to Lee Pacific, confirm with HUD that Lee Pacific had control of the partnerships, and that Lee Pacific was the owner in fact, for tax purposes. Not long thereafter, the parties began settlement negotiations.

C. *Century Pacific and Lee Pacific negotiate the settlement agreement and discuss the issue of filing TPAs with HUD*

Early settlement drafts between the parties indicated that Century Pacific would immediately transfer all partnership interests in the property-owning partnerships to Lee Pacific. One area of discussion between former counsel for Century Pacific and former counsel for Lee Pacific pertained to the approval by HUD of a document entitled "Transfer of Physical Assets" (TPA). HUD regulations required that any transfer of a HUD-insured property to a new owner included the new owner's application and HUD's approval of a TPA. Consequently, discussions between counsel for Century Pacific and Lee Pacific included whether Century Pacific should immediately transfer the partnership interests or whether Century Pacific should wait to transfer the interests until HUD approved the TPAs that the parties anticipated would need to be submitted. Lee Pacific's counsel insisted that the agreement effect an immediate transfer of partnership interests, and that, in order to ensure that HUD would work with Lee Pacific during the pendency of a TPA approval, the agreement needed to designate Lee Pacific as Century Pacific's agent during the approval period. Lee Pacific's counsel suggested including a provision in the agreement that the parties could rescind the agreement should HUD disapprove of the TPA.

About a year after the parties first began settlement discussions, a new draft of the settlement agreement was circulated that did not provide for the transfer of partnership interests. Instead, the draft agreement provided that, in lieu of Lee Pacific foreclosing on the partnership interests, Lee Pacific would gain immediate ownership to each of the housing projects once the HUD mortgage on each property was satisfied.[3] The new draft also included several new provisions pertaining to Lee Pacific's authority to manage and control the projects during the time between the execution of the agreement and the transfer of ownership in each property after its mortgage was satisfied.

---

[3] Former counsel for Lee Pacific and Century Pacific both testified at trial that the parties agreed not to transfer the partnership interests to Lee Pacific in order to avoid costly tax consequences, primarily affecting Century Pacific.

The final settlement agreement, as executed on or about February 14, 2004, by Century Pacific and Lee Pacific,[4] provided the following:

## "2.   Agency for Property-Owning Partnerships

"a.   Effective upon the execution of this Agreement by [Century Pacific], [Lee Pacific] is designated and shall act as attorney in fact for [Century Pacific] for the purposes of management and control of the Projects (subject to the provisions of this Agreement) pending a decision by HUD on whether to approve a Transfer of Physical Assets or modified Transfer of Physical Assets ('TPA') as may be required by HUD. *The purpose and effect of this designation shall be to give [Lee Pacific] full management and control of each Project pending any approval deemed necessary by HUD.* If approval is granted, full and exclusive management and control by [Lee Pacific] shall continue as to each Project until the earlier of the sale of the Project, or the transfer of the Project to the ownership of [Lee Pacific]. Pursuant to the authority granted in this Agreement (subject to any limitation expressly stated in the Agreement), [Lee Pacific] shall be authorized to act for purposes including but not limited to the following:

"(1)   for the purpose of applying for and advancing approval of Transfer of Physical Assets or modified Transfer of Physical Asset, if required by HUD to put into effect the provisions of this Agreement;

"(2)   for the purpose of full and exclusive management and control of the Project and exclusive authority to deal with HUD regarding the Projects;

"* * * * *

"(4)   for the purpose of taking actions and executing documents required by HUD to avoid violation of the

---

[4] The settlement agreement designated several groups as having various interests in the projects. Among these designations were "CP-Related Parties" and "Deutsch-Related Parties," who were two groups of partnerships with partnership interests in the property-owning partnerships, and "LP-Related Parties," who were partnerships holding partnership interests in the note-holding partnerships. Despite the complicated designations, the two entities at the center of this agreement and at the center of the ongoing dispute are Century Pacific and Lee Pacific. Consequently, throughout this opinion, in quoting from the settlement agreement, we have dropped the various designations mentioned in the agreement, and refer to the parties as either Century Pacific or Lee Pacific.

regulatory agreements governing the operation of the Projects, and to comply with HUD regulations[.] * * *

"* * * * *

"The final disapproval by HUD of a TPA or modified TPA for the transfer of management and control of a Project to [Lee Pacific] will be grounds for any Party to this Agreement to declare the termination of this Settlement Agreement and the releases contained in it as to that Project, subject to the exception below regarding attorney fees.

"* * * * *

"c.  [Century Pacific] will cooperate with [Lee Pacific], as necessary, in completion of appropriate HUD filings to renew previous governmental contracts and maintain the projects in compliance with HUD regulations * * *. [Century Pacific will not] take any action to assert management, control, or exercise any power to elect participation or non-participation in federal or state programs without specific written approval by [Lee Pacific] at any time after the effective date of this Agreement, other than to take measures which are necessary to protect its own participation with HUD in the period before HUD's approval of the TPA to [Lee Pacific].

"d.  Notwithstanding anything stated herein to the contrary, in the event of a default on any of the Project mortgages insured by HUD or the State of Oregon, * * * the right of [Lee Pacific] that is based on or originated in this Agreement to manage and control each of the Projects shall immediately terminate, and [Century Pacific] shall be entitled to apply for a TPA reversion to [Century Pacific]. In such instance, the parties hereto shall be entitled to re-file their claims * * * and nothing in this Agreement shall be construed by any party to compromise or modify or interpret any right under the Notes, Sales Agreements, or Security Agreements.

"3.  **Cooperation in Transfer of Assets, Control, Notices, Compliance.**

"[Century Pacific] will timely execute, within ten days of presentation to them, any documents HUD requests from [Century Pacific] to verify information related to the transfer of control of the Projects and interests as provided in this Agreement, and to confirm the authority of

[Lee Pacific] to take any action or prepare and execute any document required by HUD to maintain compliance of the Projects with HUD regulations and directives; and, if requested by [Lee Pacific], [Century Pacific] will timely execute, within ten days of presentation to them, any reasonable notices allowed or required under HUD regulations and directives. If [Century Pacific] fails to execute within ten days of presentation to it, a document which under this paragraph [Century Pacific is] obligated to execute within that time frame, then [Lee Pacific] is appointed as attorney in fact for the party in default, for the purpose of executing the document in behalf of [Century Pacific].

"* * * * *

"11. **Transfer of Title.** Upon the dates * * * which are the current maturity of the HUD Mortgage Notes, [Century Pacific] * * * shall, without further demand, action or compensation by [Lee Pacific], convey all of that right, title and interest * * * in the Project (including any and all Project accounts, revenues, receivables, associated personal property and real property) to the holder of the Note related to that Project, as conveyance in lieu of foreclosure of the Note. The obligation to convey the Project shall not be subject to any condition precedent other than the arrival of the [date of maturity on the HUD note], and shall not require that [Lee Pacific] * * * make any demand, proof, compensation, or take any other action to require any other party to convey the Project. This conveyance shall be effective upon the satisfaction of the HUD Mortgage. * * *

"12. **Delay Damages; Enforcement in the event of Breach.** In the event of material breach in the performance of the obligations of this Agreement, the non-breaching party will be injured, but the dollar amount of the injury will be difficult or impossible to determine; and therefore, any party injured by a material breach by another party shall be entitled to specific performance of the terms of the Agreement. Nothing stated herein shall act as a waiver of any other claims the non-breaching party may have.

"13. **Notification to HUD.** The terms of this Agreement shall be disclosed to HUD, and the parties shall all verify, as required, the transfers provided in this Agreement, and confirm that, upon such transfer, responsibility for appropriate HUD related filings shall rest with [Lee Pacific] as agent for the Property-Owning

Partnerships. [*Lee Pacific*] *shall make all efforts to vigorously pursue its application for TPA or modified TPA approval from HUD.*"

(Boldface in original; emphases added.)

D. *Post-settlement discussions regarding the meaning of the settlement agreement and whether submission of TPAs was required*

Liebreich contacted HUD officials about HUD's approval of the terms of the settlement agreement before the agreement was even signed. In September 2003, a HUD official initially indicated that Lee Pacific would need to submit to HUD a "full TPA,"[5] but, when Liebreich emphasized that there was no change of ownership in the projects until the HUD notes matured, the official suggested that Lee Pacific could "go the route of power of attorney." The official expressed concerns about this approach, though, noting that, if "the owner signs over all of their rights of ownership and, one would assume, authority and responsibility for ownership, the department would view that as a change of ownership. That would invoke full TPA requirements."

After the agreement was signed, Liebreich presented the agreement to HUD officials and continued to manage the properties. Liebreich also continued to have sporadic conversations with various HUD officials about the settlement agreement. In October 2005, HUD official Greenman spoke to Liebreich,[6] and Liebreich again indicated that, based on the fact that the settlement agreement did not transfer ownership of the properties to Lee Pacific, Liebreich did not believe that Lee Pacific needed to submit a TPA to HUD. Greenman did not indicate whether a TPA was

---

[5] Under HUD regulations, there are TPAs and modified TPAs. According to HUD instructions, a "full TPA" is "a property sales transaction involving the assumption of a HUD-insured loan." Modified TPAs are required when "the transaction does not involve a complete change of ownership." For example, a modified TPA would be required when more than 50 percent of the interest in the property-owning partnership is transferred, but the partnership itself remains the property owner.

[6] Lee Pacific offered into evidence, without objection, transcripts from recordings of telephone conversations that he had had with various HUD officials. Greenman's statements were made during the course of one of these telephone conversations.

needed, but instead requested a detailed explanation of the various partnership interests in the properties. Greenman also explained that HUD's biggest concern was knowing which entity had legal responsibility to HUD:

"[W]e don't basically care that you're the owner's agent in many things because it's the owner we want it through[, because] * * * legally if we have to go to court, * * * , we don't take the owner's agent to court we take the owner. * * * So, that's where HUD always comes from. They're looking at well, who is the person we're going to hold accountable if we have to go to court."

In February 2006, Greenman contacted both Century Pacific and Guardian Management regarding Indiana Manor, one of the eight HUD-insured properties. Greenman requested information "that correctly identifies all the participants [and] a *flow chart* to assist us in understanding who all the players are in the LLC." (Emphasis in original.) Greenman further stated:

"Howard Liebreich isn't the HUD-recognized owner and has currently been referred to the Departmental Enforcement center until he provides HUD with a Transfer of Physical Assets package that we can review and approve. Regardless of court case outcome, he does not have the legal authority to sign on behalf of the ownership entity with HUD."

That e-mail from Greenman set off a pattern of interactions among Century Pacific, Lee Pacific, and HUD officials. Century Pacific began demanding of Lee Pacific that it submit a TPA; Liebreich would again discuss the meaning of the settlement agreement with HUD officials, maintaining that Lee Pacific's control and management of the properties did not require the submission of a TPA; and HUD would ask for clarification of the parties' relationship to each other and to the properties. The communications between HUD and the respective parties indicated that each party had a different concern: Lee Pacific wanted HUD to recognize Lee Pacific as the manager and controller of the properties; Century Pacific wanted HUD to no longer hold Century Pacific responsible for the properties. Because they emphasized different concerns, their respective discussions with HUD led to different understandings. Liebreich believed that HUD would accept Lee Pacific as the manager

and controller of the properties if Century Pacific submitted separate power of attorney documents indicating that Lee Pacific was acting as Century Pacific's agent. Century Pacific's counsel understood that HUD wanted Lee Pacific to submit TPAs for the properties.[7]

By early 2008, other issues surfaced that heightened the tension between the parties. In January 2008, Lee Pacific notified Guardian Management that it was terminating Guardian Management's management contract for one of the projects, Firwood Village, but requested that Guardian Management continue managing the other properties. In February 2008, Guardian Management requested additional funds from Lee Pacific to cover costs at another project, Indiana Manor. Guardian Management apparently did not receive additional funds from Lee Pacific, and HUD notified Century Pacific that it was expected to provide additional funding for Indiana Manor, because Century Pacific was still the general partner of the limited partnership that owned the properties.

In March 2008, HUD notified Century Pacific that the cash flow problems at Indiana Manor and the physical condition of Firwood Village[8] raised concerns at HUD, and HUD expected Century Pacific to assure full compliance with all HUD program requirements. HUD further indicated that those issues "raise[d] a broader question" regarding ownership and control of the projects. Referring to the settlement agreement, HUD asked for information regarding "the intent of the parties in signing that document and the status of the [a]greement." HUD noted that it had not received an application for a TPA in the four years since the settlement agreement was signed:

"Did you intend to transfer ownership to Lee Pacific Properties, Inc.? If so, you need to submit the TPA requests for HUD approval. If the owners intend to retain

---

[7] Century Pacific was particularly concerned that any violations or deficiencies at the properties would be attributed to Century Pacific. HUD keeps a database of the entities with interests in HUD-insured projects, and "flags" an entity when it violates HUD regulations. A flagged entity may lose future opportunities to own and operate HUD-insured properties.

[8] HUD, in inspecting Firwood Village in 2006 and 2007, had twice scored its physical condition low enough to refer the property to HUD's enforcement center.

ownership, we need a clear expression of your commitment as the General Partner for their financial and physical well being."

Century Pacific did not respond directly to HUD. Instead, Century Pacific's counsel sent a letter, dated March 27, 2008, addressed to Liebreich and Lee Pacific, with copies to HUD and Guardian Management. In that letter, Century Pacific stated that Lee Pacific had breached the settlement agreement by failing to submit TPA applications. The letter further stated that Lee Pacific's status as Century Pacific's agent or attorney-in-fact was "hereby revoked in its entirety."

Lee Pacific did not stop managing the properties, and it continued to ask HUD what documents HUD needed to approve the terms of the settlement agreement. In an e-mail response to Liebreich's question whether a full TPA was required, HUD official Shea stated, "Our position on this has been consistent since 2000, a full TPA is required." Other HUD officials likewise indicated that HUD wanted Lee Pacific to file a TPA for each property, and at least one official pointed out to Lee Pacific's counsel certain language in a HUD handbook, entitled "Questionable Transactions," which stated:

"When faced with a transaction which does not fall clearly into the full or modified review category, but which the Field Office believes may warrant HUD review, the following questions should be asked: Will there be a significant change in control of the project? Will a significant sum of money change hands in conjunction with the transaction? If either of these inquiries are answered in the affirmative, a Transfer of Physical Assets Application, either Full or Modified, depending on the nature of the transaction, should be required by the Field Office."

Lee Pacific continued to point out that HUD was basing its decision on the mistaken presumption that Lee Pacific was assuming ownership of the projects. In response to Lee Pacific's continued objections to HUD's understanding of the agreement, Shea contacted Century Pacific's counsel on May 19, 2008, stating:

"This is to confirm the issues we *** discussed with you in our teleconference. *** [HUD's position is] that short of a TPA, Liebreich would have to obtain a Power of Attorney,

which would specifically define actions he could take as the Owner Agent for Century Pacific. For example, some of the actions could be; the ability to * * * hire and terminate management agents and select contract renewal options. We offered the same opportunity several years ago to Liebreich, but neither the Power of Attorney nor a TPA was ever submitted."

In July, Shea sent a different message to Century Pacific's counsel:

"On June 27, 2008, [HUD officials] met with Howard Liebreich and [his counsel]. Once again, we restated our position that we would be requiring a full TPA, short of a few requirements, such as Physical Needs Assessment. HUD offered to provide a specific list of requirements to complete the full TPA, but Liebreich and [his counsel] declined. It was HUD's understanding that Liebreich would seek a Power of Attorney from Irving Deutch to act as the owner for specific functions."

A few days later, Lee Pacific's counsel sent a letter to Century Pacific's counsel, attaching a power of attorney document for Century Pacific to sign and stating:

"It is [HUD's] position after consultations with * * * Greenman, that there is no need for a full TPA for the properties (and in fact, since title to the properties has not been transferred, a full TPA would not be appropriate.) They also do not believe that the situation with these properties falls into the specific categories for a Modified TPA. Their conclusion, with which we concur, is that the appropriate approach is to obtain what we have all agreed to call a 'Change of Control TPA.'

"* * * * *

"The other way to accomplish a Change of Control TPA (again according to HUD officials), is for Century Pacific to execute and deliver to HUD a power of attorney naming Lee Pacific as the party with whom they are to deal."

A HUD official confirmed to Century Pacific's counsel that the above information was "technically correct." The official further stated:

"We had a huge hang up over the term full v. modified TPA. After much debate we concluded to call it something different which was 'change of control.' It is basically a 'full' TPA

with a few items not required * * *. Century Pacific would still be an entity of the ownership but Lee Pacific would be the responsible owner.

"The other option would be the Power of Attorney. * * * I would need [HUD counsel's] opinion if it would work unless you tell me it is a non-starter upfront."

In November 2008, Lee Pacific's counsel wrote Century Pacific's counsel the following:

"On July 21, 2008, I provided you with a form of power of attorney taken verbatim from the Settlement Agreement.

"* * * * *

"If we cannot get full cooperation from Century Pacific so that these properties can be effectively managed, we will have no choice other than to reinitiate the litigation that the Settlement Agreement was intended to resolve."

Thereafter, Century Pacific began to reassert its management of the properties, notifying Guardian Management that Lee Pacific did not have authority to terminate Guardian Management's services at any of the housing projects. Century Pacific also offered the properties for sale through a third-party agent. Meanwhile, HUD, relying on Century Pacific's assertions that Lee Pacific did not have authority to act on behalf of Century Pacific, ceased, to some extent, to communicate with Lee Pacific about the properties.

Lee Pacific filed suit against Century Pacific shortly thereafter, seeking declaratory relief and specific performance of the settlement agreement, as well as claiming legal damages for breach of contract. Century Pacific counterclaimed, seeking declaratory relief and specific performance of the settlement agreement.

Even after the suit was filed, both parties continued to confer with HUD as to whether HUD required a TPA—full or modified—to approve the provisions of the settlement agreement. HUD's final statement came from HUD official Fandel on May 20, 2010:

"A transfer of Physical Assets (TPA) comes in two basic forms: a 'full TPA' when title is transferred or when substantial control is transferred, typically by a transfer of more than 50% interest in the owner entity; a 'modified

TPA' when ownership interests change without a substantial change in control. In either case, HUD approval is required by the Regulatory Agreements.

"The controversy in question was most recently occasioned when the parties presented HUD with a settlement agreement which provided that Mr. Liebreich had authority to select the management agent and required Mr. Liebreich to present a TPA application to HUD which would replace the current owner with Mr. Liebreich's company. HUD considers this a substantial change of control and requires a 'full TPA.'

"* * * * *

"At several times during the course of discussion among the parties and HUD, the question of Power of Attorney arose. A typical Power of Attorney gives the attorney authority to act on behalf of the principal, and for the benefit of the principal. This is not uncommon and does not trigger a TPA—title and control would remain with the original owner. It would be uncommon to have a Power of Attorney that transferred substantial operation and control to the attorney, and it was not clear that the parties could actually accomplish this. We have not seen this scenario before, and doubted that the parties would agree to this.

"HUD has not required any actions from the parties other than that they comply with their obligations under the Regulatory Agreements and request HUD approval of change in ownership or control of the projects. *The means for doing this have been left to the parties.*"

(Emphasis added.) Lee Pacific has never submitted TPAs to HUD and Century Pacific has never submitted separate power of attorney documents designating Lee Pacific as its agent.

E.   *Century Pacific declines to transfer title in the Surfwood Manor property after the mortgage is satisfied*

In December 2009, after the parties had brought suit against one another, the HUD note on the property Surfwood Manor matured and the HUD mortgage was satisfied. Lee Pacific demanded that Century Pacific transfer title of Surfwood Manor to Lee Pacific, and Lee Pacific contacted Century Pacific multiple times from December 2009

through May 2010 about receiving title to Surfwood Manor. Century Pacific did not transfer title, and that failure to transfer title eventually became a basis for further claims in this case.

## II. PROCEDURAL HISTORY

Lee Pacific's original complaint against Century Pacific sought declaratory relief, specific performance of the settlement agreement, and legal damages for breach of contract. Century Pacific counterclaimed, seeking declaratory relief and specific performance of the settlement agreement. The parties agreed to bifurcate Lee Pacific's legal claims for a later trial date, and most of the equitable claims of both parties were tried in June 2010.

A. *2010 trial on Lee Pacific's first and second claims for relief and Century Pacific's first, second, and third counterclaims*

Lee Pacific requested, in its first claim for declaratory relief, that the trial court enter multiple declarations regarding the legal obligations of the two parties, including a declaration that there had been "no final disapproval by HUD of a TPA that would entitle any party to terminate the [settlement agreement]."[9] Lee Pacific's second claim for

---

[9] Lee Pacific requested eight other declarations in its first claim for declaratory relief, including:

"(2) Any delay in obtaining a TPA or modified TPA by any of the plaintiffs, is not a material term or condition of the Settlement;

"(3) If a delay in obtaining a TPA or modified TPA is material, the Defendants are estopped from terminating the Settlement as a result of their failure and refusal to execute the [Power of Attorney document] and to cooperate in obtain[ing] a Change of Control TPA;

"(4) If any material breach occurred as a result of any failure to obtain a TPA or modified TPA, the Defendants waived such breach by accepting the benefits, Mortgage Note payments, services, management and control of the Projects from the Plaintiffs;

"(5) If a failure to obtain a TPA or modified TPA has occurred that Defendants are not estopped from asserting is a material breach, and has not been waived, the Defendant's remedy is to prove the dollar amount of damages or to sue for specific performance;

"(6) If money damages or specific performance is not the sole remedy available for any failure to obtain a TPA or modified TPA, then the Defendants' unconditional obligation to transfer title upon the occurrence of the date of maturity of the Mortgage Loan is not discharged[.]"

specific performance requested an order that Century Pacific specifically perform its obligation under the settlement agreement to not interfere with Lee Pacific's right to manage and control the properties. The 2010 trial also dealt with three counterclaims by Century Pacific, only one of which is at issue in this appeal. That counterclaim for specific performance requested that the trial court order Lee Pacific to submit TPAs to HUD.

During the three-day trial on those claims, the arguments centered on two issues: (1) whether Lee Pacific had an unconditional obligation, under the settlement agreement's terms, to submit TPAs to HUD; and (2) whether Century Pacific had an obligation, based on the terms of the settlement agreement and HUD's communications to the parties, to submit power of attorney documents to HUD in order to confirm Lee Pacific's management and control of the properties. Lee Pacific's main argument was that it was not required to submit TPAs; therefore, under the terms of the settlement agreement, Century Pacific could not terminate Lee Pacific's management and control of the properties, and further, based on HUD's communications, Century Pacific should have submitted power of attorney documents. Century Pacific argued that the settlement agreement unconditionally required Lee Pacific to submit TPAs to HUD and that its failure to do so was a material breach of the settlement agreement; therefore, under the terms of the settlement agreement, Century Pacific was entitled to take over management and control in order to protect its record with HUD, but Lee Pacific was still under a duty to submit the TPAs.[10]

The trial court issued an opinion, dated June 16, 2010, declaring, *inter alia*, that (1) the settlement agreement did not require Lee Pacific to submit TPAs to HUD; (2) the parties expected that Lee Pacific *would* submit TPAs to HUD; and (3) under the terms of the settlement agreement, Lee Pacific's management and control of the properties was not permanent until HUD approved of the TPAs,

---

[10] Century Pacific also argued, at various times, that Lee Pacific's breach of the settlement agreement excused Century Pacific's further performance of the agreement's terms, specifically, the obligation to transfer ownership of the properties to Lee Pacific. *See* 272 Or App at 643.

and, absent such approval, Century Pacific could revoke Lee Pacific's authority. Consequently, the trial court denied both parties' claims for specific performance.

B. *2011 trial on Lee Pacific's third and fifth claims for relief*

After the trial court issued its June 2010 opinion, but before it entered a judgment, Lee Pacific filed an "Amended and Supplemental Complaint" (amended complaint) that, *inter alia,* asserted, as its third claim for relief, breach of contract, and as its fifth claim for relief, specific performance. Both claims were based on the allegation that Century Pacific was obligated, under the settlement agreement, to transfer title in Surfwood Manor to Lee Pacific, and Century Pacific had failed to transfer title.[11]

Approximately one year after the 2010 trial, the trial court held another trial solely on the issue of Surfwood Manor's transfer, and in an order dated July 19, 2011, the trial court ordered Century Pacific to transfer title to Surfwood Manor to Lee Pacific and to pay Lee Pacific $139,081.51 in equitable damages.

C. *The trial court enters judgment disposing of all the claims raised in the 2010 and 2011 trials*

Eventually, the trial court entered judgment, explaining that it was disposing of four of Lee Pacific's claims and three of Century Pacific's counterclaims, consistently with its June 2010 opinion and July 2011 order. Ultimately, the trial court granted judgment in favor of Lee Pacific on its first claim for declaratory relief and its fifth claim for specific performance but denied its second claim for specific performance and denied its third claim for breach of contract as moot. The court also dismissed Century Pacific's three counterclaims. Consequently, in determining the attorney fee award, the trial court concluded that Lee Pacific was the prevailing party on five of the total claims

---

[11] Although the trial court designated these claims as Lee Pacific's third and fifth claims for relief, the amended complaint does not so number them. For simplicity, we refer to the claims consistently with the trial court's references. Further, we note that it is not clear from the amended complaint what the fourth claim for relief was. The trial court never refers to this claim, and it is not at issue on appeal.

and counterclaims, and Century Pacific was the prevailing party on one. The judgment awarded Lee Pacific its attorney fees in the amount of $232,525.17 and costs in the amount of $19,118.64.

Lee Pacific appeals, and Century Pacific cross-appeals. As to its first claim for declaratory relief, Lee Pacific assigns error to the trial court's declaration, and certain accompanying declarations, that, until Lee Pacific submitted the TPAs, its management and control of the properties was subject to revocation. Lee Pacific also assigns error to the denial of its second claim for specific performance of Century Pacific's alleged obligation to submit power of attorney documents to HUD. Finally, as to its fifth claim for relief, Lee Pacific assigns error to the trial court's calculation of equitable damages. On cross-appeal, Century Pacific assigns error to the trial court's denial of its second counterclaim for specific performance and the award of attorney fees to Lee Pacific.

## III. DISCUSSION

The majority of the assignments of error in this case pertain to the trial court's declarations. We therefore begin by setting forth the trial court's declarations that are pertinent to these assignments of error:

"(a)   The Settlement Agreement did not unambiguously and unconditionally require [Lee Pacific] to submit a [TPA] application to [HUD];

"(b)   The parties assumed and intended that Lee Pacific would submit a TPA application to HUD after the parties entered into the Settlement Agreement;

"(c)   Lee Pacific's submission of a TPA application to HUD was a condition, that is, it was an event that must occur before [Century Pacific] was obligated under the Settlement Agreement to give Lee Pacific full and exclusive authority to manage and control the projects prior to any sale or conveyance of the projects to Lee Pacific under the terms of the Settlement Agreement;

"(d)   At the time the parties entered into the Settlement Agreement, they intended that (i) Lee Pacific would be granted temporary authority to manage and control the

projects as Century Pacific's attorney-in-fact pending a decision by HUD on the TPA application the parties assumed would be submitted, and (ii) thereafter, Lee Pacific would be entitled to full and exclusive authority to manage and control the projects until the projects were sold or the property-owning partnership interests were transferred to Lee Pacific if HUD approved Lee Pacific's TPA application;

"(e)    The Settlement Agreement does not specify what would happen to Lee Pacific's temporary authority to manage and control the projects as Century Pacific's attorney-in-fact if Lee Pacific did not submit a TPA application to HUD;

"(f)    The Settlement Agreement is ambiguous as to the duration and termination of Lee Pacific's temporary authority to act as Century Pacific's attorney-in-fact, but the parties did not intend Lee Pacific's temporary authority to act as Century Pacific's attorney-in-fact to last indefinitely;

"(g)    Century Pacific was entitled under the circumstances to terminate Lee Pacific's temporary authority to act as Century Pacific's attorney-in-fact on March 27, 2008;

"(h)    The conditions triggering Century Pacific's obligation to give Lee Pacific full and·exclusive authority to manage and control the projects—beyond the temporary authority granted pending a decision by HUD—until they were sold or transferred to Lee Pacific did not occur, and were not waived or excused[.]"

Lee Pacific first assigns error to the trial court's declarations that: (1) Lee Pacific's agency authority was temporary, and continuing management authority was conditioned on Lee Pacific submitting TPAs to HUD; (2) the submission of TPAs to HUD was not waived or excused; and (3) Lee Pacific's failure to submit TPAs within a reasonable period of time rendered Lee Pacific's temporary authority subject to revocation by Century Pacific.[12] In its second assignment of error, Lee Pacific argues that the trial court erred in denying Lee Pacific's claim for specific performance to compel Century Pacific to submit separate power of attorney documents to HUD. Century Pacific's first assignment

---

[12] Lee Pacific characterizes the declarations somewhat differently, but our characterization is consistent with Lee Pacific's claimed errors and with the trial court's declarations.

of error on cross-appeal is that the trial court erred in denying its counterclaim for specific performance by concluding that the settlement agreement did not require Lee Pacific to submit TPAs to HUD.

We believe that these assignments of error can be addressed by answering three questions. First, under the terms of the settlement agreement, was Lee Pacific unconditionally required to submit TPAs to HUD? Second, under the terms of the settlement agreement, was Century Pacific required to submit separate power of attorney documents to HUD? Third, was Century Pacific's revocation of Lee Pacific's agency a breach of the settlement agreement? We also address the assignments of error unrelated to those three questions, which concern whether the trial court erred in its award of equitable damages and whether the trial court erred in its award of attorney fees.

A.  *Did the settlement agreement require Lee Pacific to submit TPAs to HUD?*

We begin by addressing the key issue that led to the breakdown of the parties' contractual relationship and that answers Century Pacific's first assignment of error on cross-appeal, namely, whether the trial court erred in concluding that the settlement agreement did not require Lee Pacific to submit TPAs for each property. The trial court concluded that the settlement agreement was ambiguous in its treatment of the TPA submission, and that the ambiguity resulted, in large part, from what the trial court considered as inconsistent—and perhaps contradictory—provisions in sections 2 and 13 of the settlement agreement.

Section 13 provides, in pertinent part, "[Lee Pacific] shall make all efforts to vigorously pursue its application for TPA or modified TPA approval from HUD." The trial court concluded that this language "appears to presume that Lee Pacific would submit a TPA application." However, the language in section 2, the trial court concluded, "demonstrate[s] that neither party was certain that a TPA application was required." In particular, the trial court pointed to the "conditional terminology" in section 2, which includes the phrases "pending a decision by HUD on whether to approve a [TPA] or [modified TPA] as may be required by

HUD"; and "for the purpose of applying for and advancing approval of [a TPA or modified TPA] if required by HUD to put into effect the provisions of this Agreement[.]" Thus, the trial court determined it was impossible to ascertain the parties' intent regarding the submission of TPAs from the settlement agreement alone.

On appeal, both parties contend that the trial court erred in concluding that the settlement agreement was ambiguous. Century Pacific argues that the provisions can be interpreted consistently, and that they unambiguously require Lee Pacific to submit TPAs. Lee Pacific counters that these same provisions, interpreted correctly, unambiguously require the submission of TPAs only under certain conditions.

In construing a contract, the court is to pursue the parties' intention, if possible. ORS 42.240. To do so, the court "first considers the text of the disputed provision in the context of the contract as a whole to determine whether the disputed provision is ambiguous." *Williams v. RJ Reynolds Tobacco Company*, 351 Or 368, 379, 271 P3d 103 (2011). In *Williams*, the court explained:

> "A contractual provision is ambiguous if its wording can, *in context*, reasonably be given more than one plausible interpretation. Whether a provision is ambiguous is a question of law, as is the meaning of an unambiguous provision. The court must, if possible, construe the contract *so as to give effect to all of its provisions. See* ORS 42.230 (in construing a document, the court is 'to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such construction is, if possible, to be adopted as will give effect to all'). If the meaning of the provision is clear from the text and context, then the analysis ends."

*Id.* at 379-80 (some citations and internal quotation marks omitted; emphasis added).

Century Pacific argues that the language in section 13 is the key language in the agreement regarding Lee Pacific's duty to submit TPAs. That provision, Century Pacific argues, unambiguously indicates that Lee Pacific

promised to vigorously pursue the submission of TPAs. Moreover, Century Pacific argues, sections 2 and 13 of the agreement contain multiple references to the submission of TPAs, evidencing the intention of the parties to require Lee Pacific to submit TPAs. For instance, Century Pacific points out the following references: (1) the agreement states that "the final disapproval by HUD of a TPA or modified TPA" is grounds for terminating the agreement; (2) Century Pacific may take measures necessary to protect its HUD record "in the period before HUD's approval of the TPA"; and (3) a default on any HUD mortgage allows Century Pacific to apply for a TPA reversion. None of these clauses would be in the settlement agreement, Century Pacific argues, if a TPA application were not required.

Although we agree with Century Pacific that those phrases contemplate that Lee Pacific would submit TPAs, we cannot so easily dismiss the conditional wording that even Century Pacific concedes is also present in the settlement agreement. As Lee Pacific points out, in referring to the submission of TPAs, section 2 also includes phrases such as "as may be required by HUD" and "if required by HUD." Perhaps most significant is the statement-of-purpose language in section 2, "The purpose and effect of [the attorney-in-fact] designation shall be to give [Lee Pacific] full management and control of each Project pending any approval *deemed necessary by HUD*." (Emphasis added.) Those phrases indicate that any duty to submit TPAs is preceded by the condition that HUD require the submissions. *See Gender Machine Works v. Eidal Internatl. Sales Corp.*, 145 Or App 198, 209, 929 P2d 1033 (1996) (citing E. Allan Farnsworth, II, *Farnsworth on Contracts* § 8.2, 346 (1990), for premise that often, conditions precedent are signaled by language such as "if," "on condition that," "provided that," "in the event that," and "subject to").

Century Pacific argues that the conditional language in section 2 conditions only the *type* of TPA (full or modified); it does not condition *whether* Lee Pacific will submit a TPA. Consequently, the language can still be interpreted to be consistent with section 13's language, "shall * * * vigorously pursue * * * [TPA applications,]" which means

that Lee Pacific had an unconditional obligation to submit TPA applications.

With due respect to Century Pacific's arguments, we read the conditional language as creating a condition precedent to Lee Pacific's submissions to HUD. The condition precedent is HUD's determination of what it deems necessary to accept Lee Pacific's management and control. Thus, it is HUD—not Lee Pacific, Century Pacific, or other provisions in the settlement agreement—that controls the fulfillment of the condition precedent. A condition precedent is "one that must occur before liability arises on the promise that the condition qualifies." *Phoenix-Talent School Dist. # 4 v. Hamilton*, 229 Or App 67, 73, 210 P3d 908, *adh'd to as modified on recons*, 230 Or App 330, 215 P3d 111 (2009). Thus, despite multiple instances in the settlement agreement's language indicating that the parties expected that Lee Pacific would submit TPAs, under the terms of the settlement agreement, HUD must first determine what it deems necessary to accept Lee Pacific's management and control under the settlement agreement, before Lee Pacific has an obligation to submit the required documents to HUD.

The trial court concluded that the settlement agreement's conditional language provisions contradicted the other language evidencing an expectation that Lee Pacific would submit TPA applications. Read alone, section 13 does contain a promise by Lee Pacific to vigorously pursue its TPAs, and one could infer from that promise that Lee Pacific had an unconditional duty to submit TPAs. However, in interpreting a contract, we are to look at its full text and context, and not simply one provision. Moreover, ORS 42.240 instructs us that, "when *** general and particular provision[s] are inconsistent, the latter is paramount to the former. So a particular intent shall control a general one that is inconsistent with it." Section 13 and other sections in the agreement place various requirements on Lee Pacific pertaining to the submission of TPAs, and all of this language evidences the general intention that Lee Pacific would submit TPAs. However, the conditional language in section 2 evidences a *particular* intention with regard to the TPA submission—the submission will be conditioned on HUD determining what submission HUD deems necessary.

In short, we disagree with the trial court's conclusion that the agreement is ambiguous. The various provisions of the agreement can be harmonized under an interpretation that conditioned Lee Pacific's obligation to submit TPAs—full or modified—on HUD first determining what submissions it deemed necessary to accept Lee Pacific's management and authority under the terms of the settlement agreement.

Having concluded that Lee Pacific's duty to submit TPAs is conditioned on HUD's determination of what it deems necessary, we turn to whether HUD made a determination in this case. In their appellate arguments, both parties make assertions about what HUD required (Century Pacific argues that, based on the intention of the parties that Lee Pacific would have full control of the properties, HUD required a TPA; Lee Pacific counters that, because it did not have title to the properties and because HUD indicated that a power of attorney document would be sufficient, HUD did *not* require a TPA.). Neither party, however, specifically answers the question of whether *HUD determined* what it deemed necessary to accept Lee Pacific's management and control of the properties, and the trial court made no factual findings in this regard. We conclude that the existing record supports only one finding—that is, that HUD made no such determination—and, as previously explained, 272 Or App at 610-11, we exercise our discretion under ORS 19.415(3)(b) to make that necessary finding *de novo*.

The facts indicate that the parties' differing explanations to HUD of the nature of Lee Pacific's "management and control" of the properties affected HUD's understanding of Lee Pacific's power, thereby leading to different statements by HUD at different times about what was necessary to accept Lee Pacific's management and control. When Century Pacific would explain to HUD that the settlement agreement required Lee Pacific to submit a TPA and that Lee Pacific had all control and Century Pacific had none, HUD would respond that it needed a TPA. When Lee Pacific would explain that it did not have title to the properties and was only Century Pacific's attorney in fact, HUD would indicate that a power of attorney document would be acceptable. Nevertheless, HUD never clearly defined what submissions it deemed necessary. In the end, HUD determined only that

it did not require "any actions from the parties other than that they comply with their obligations under the regulatory agreements and request HUD approval of change in ownership or control of the projects. The means for doing this have been left to the parties." Consequently, we find that HUD never determined what it deemed necessary to accept Lee Pacific's management and control under the terms of the settlement agreement. In the absence of such a determination, for the reasons explained above, the settlement agreement did not obligate Lee Pacific to submit TPAs. Accordingly, although we interpret the settlement agreement somewhat differently than the trial court did, we ultimately reach the same conclusion. The trial court did not err in denying Century Pacific's counterclaim for specific performance of the agreement.

B. *Under the terms of the settlement agreement, was Century Pacific required to submit to HUD signed power of attorney documents recognizing Lee Pacific as having management and control of the properties?*

Lee Pacific argues that, because HUD indicated that it would have accepted power of attorney documents in order to acknowledge Lee Pacific as the party in control of management of the properties, Century Pacific was obligated to submit those documents. Lee Pacific bases that contention on section 3 of the settlement agreement. Section 3 provides, in pertinent part:

"[Century Pacific] will timely execute * * * any documents HUD requests from [Century Pacific] to verify information related to the transfer of control of the Projects and interests as provided in this Agreement, and to confirm the authority of [Lee Pacific] to take any action or prepare and execute any document required by HUD to maintain compliance of the Projects with HUD regulations and directives."

Lee Pacific argues that Century Pacific had a duty to put into effect the provisions of the settlement agreement, and, in light of the fact that HUD indicated that it would accept Lee Pacific as the "controlling entity" if it was given power of attorney documents, Century Pacific was required to submit those documents.

We note, initially, that just as with the submission of TPAs, there was no unconditional obligation in the settlement agreement for Century Pacific to execute power of attorney documents recognizing Lee Pacific's management and control of the properties. As we have already noted, Lee Pacific's obligation to submit anything to HUD was conditioned on HUD determining what it deemed necessary to accept Lee Pacific's management and control.

Moreover, there is nothing in section 3 of the settlement agreement that requires Century Pacific to submit power of attorney documents. Section 3 requires Century Pacific to submit documents under two different circumstances. In the first circumstance, Century Pacific is to submit "any documents HUD requests." The evidence indicates, at most, that HUD said that it would accept power of attorney documents; it does not indicate that HUD requested or required them. Instead, HUD left it to the parties to determine what documents they should submit to HUD. Thus, the requirement that Century Pacific submit "any documents HUD requests" did not obligate Century Pacific to submit power of attorney documents.

Section 3 also requires Century Pacific to "confirm [Lee Pacific's] authority to take any action required by HUD to maintain compliance * * * with HUD regulations." As we understand Lee Pacific's argument pertaining to that requirement,[13] it is that, even if HUD did not request or otherwise deem it necessary for Century Pacific to submit power of attorney documents, the nature of the agency relationship created by the settlement agreement was such that Century Pacific had an obligation to do what was necessary to obtain HUD's approval of Lee Pacific's management and control of the properties. That issue is better addressed in the context of whether Century Pacific was entitled to revoke its agency authority. For now, we conclude that the express terms of the settlement agreement did not require Century Pacific to submit power of attorney documents to HUD, and that HUD did not require Century Pacific to do so.

---

[13] On appeal, Lee Pacific also argues that Century Pacific is subject to similar requirements under section 2c of the settlement agreement.

C. *Did Century Pacific breach the settlement agreement when it revoked Lee Pacific's agency to control and manage the properties?*

The success of Lee Pacific's first two assignments of error is dependent on whether the trial court misunderstood the nature of Lee Pacific's management and control of the properties. The trial court concluded that Lee Pacific's management and authority was temporary until HUD approved the TPA, and, as such, Century Pacific was under no obligation to continue to confer that management authority after a reasonable amount of time had lapsed without Lee Pacific submitting TPAs. Thus, as we understand the trial court's determination, the settlement agreement created two degrees of management authority in Lee Pacific: a revocable agency that existed until HUD approved Lee Pacific's management and control, and an irrevocable agency that would be triggered when HUD approved Lee Pacific's management and control. Under the trial court's reasoning, because Century Pacific revoked Lee Pacific's management authority at a time when it was still temporary and revocable, Century Pacific did not breach the settlement agreement.

Lee Pacific argues that that ruling was erroneous because the settlement agreement, by its terms, provided Lee Pacific with irrevocable agency authority immediately. Century Pacific counters that the settlement agreement's language provides for two distinct agency relationships. Section 2a, Century Pacific argues, provides that, upon execution, Lee Pacific "shall act as attorney in fact for [Century Pacific] for the purposes of management and control * * * pending a decision by HUD whether to approve a [TPA or modified TPA.]" The section goes on to say that, if approval of the TPA is granted, "full and exclusive management and control by [Lee Pacific] shall continue." Century Pacific argues that, by using the words "attorney in fact * * * for purposes of management and control" in juxtaposition to the words "full and exclusive management and control," the settlement agreement provides that the pre-approval management was temporary and the post-approval management was permanent. Lee Pacific responds that Century Pacific ignores the rest of the language in 2a, which states that the

post-approval exclusive management and control "shall continue," indicating that Lee Pacific management and control of Century Pacific was the same before and after approval. We need not decide whether the terms support Lee Pacific's interpretation that its authority was irrevocable from the time of the settlement agreement's execution, or instead support Century Pacific's interpretation that Lee Pacific's authority was revocable until the TPAs were submitted to and accepted by HUD. That is so because, under either interpretation, Century Pacific did not breach the agreement when it revoked Lee Pacific's authority.

As Lee Pacific points out, an irrevocable agency is not a traditional agency relationship. In a traditional agency relationship, powers are held for the benefit of the principal. *Hampton Tree Farms, Inc. v. Jewett*, 320 Or 599, 617, 892 P2d 683 (1995) (agency is consent by the agent to the principal that the agent shall act on behalf and subject to the principal's control); *see also Vaughn v. First Transit, Inc.*, 346 Or 128, 136, 206 P3d 181 (2009) (an agency exists when an individual acts under another person's control and acts on behalf of that person). As such, an agent's authority to act for the principal is revocable. *Restatement (Second) of Agency* § 118 (1958) ("Authority terminates if the principal or the agent manifests to the other dissent to its continuance."); *In re Clostermann*, 276 Or 261, 264, 554 P2d 467 (1976) ("A power of attorney is revocable.").

An irrevocable agency is an agency coupled with an interest, and the "agent" holds its interest for the agent's benefit. Section 138 of the *Restatement* explains:

"A power given as security is a power to affect the legal relations of another, created in the form of an agency authority, but held for the benefit of the power holder * * * and given to secure the performance of a duty or to protect a title, either legal or equitable, such power being given when the duty or title is created or given for consideration."

Section 139 provides that such a power is irrevocable:

"(1) Unless otherwise agreed, a power given as security is not terminated by:

"(a) revocation by the creator of the power[.]"

In *Scott v. Hall*, 177 Or 403, 407-08, 163 P2d 517 (1945), the court stated:

> "It is familiar law that an agency, coupled with an interest in the thing upon which the agency operates, is irrevocable. *Sphier v. Michael*, [112 Or 299, 313, 227 P 1100 (1924).] And it is likewise established that if an agency or power is given as a security, it is, from its very nature and character in contemplation of law, irrevocable."

(Some citations and internal quotation marks omitted.)

Lee Pacific argues that the settlement agreement conferred irrevocable management and control powers upon Lee Pacific as contemplated by section 138 of the *Restatement*. According to Lee Pacific, it held an "equitable interest" in the property "because of defendants' default under the security agreements and the wrap notes," and, as evidenced by the language of the settlement agreement and common-law agency principles, those management and control powers could not be terminated by Century Pacific.

Nevertheless, assuming, without deciding, that the settlement agreement provided for irrevocable agency powers, and was thus an agency coupled with an interest, even a power coupled with an interest can be terminated upon certain occurrences. Section 139 states that a power given as security "is terminated by * * * the happening of events which * * * makes its execution illegal or impossible." In this case, the properties are each subject to a regulatory agreement with HUD, and that agreement provides that the property owner cannot convey or transfer the property, or convey, assign, or permit the surrender of any right to manage the property without prior written approval of HUD. The evidence indicates that HUD had not approved the transfer of the interests and powers that Lee Pacific now claims to have.[14] Rather, HUD's correspondence indicates that, if the

---

[14] Lee Pacific's asserted irrevocable right to manage and control the properties could also be construed as an asserted assignment of a right. *Restatement (Second) of Contracts* § 317 (1981) defines the assignment of a right as

"a manifestation of the assignor's intention to transfer [a right] by virtue of which the assignor's right to performance by the obligor is extinguished * * * and the assignee acquires a right to such performance."

settlement agreement transferred *control* of the properties to Lee Pacific, HUD wanted Lee Pacific to submit a "full TPA" in order to accept Lee Pacific's powers and interests. Thus, absent the submission of the full TPA to HUD, and HUD's subsequent approval, any equitable assignment to Lee Pacific of the property or assignment to Lee Pacific of the right to manage the property would be in violation of HUD's regulatory agreement with Century Pacific and, consequently, its regulatory authority over the properties.

In *Compton v. Compton*, 187 Or App 142, 145, 66 P3d 572 (2003), the court held that a contract is unenforceable if its purpose is against public policy, which may include the violation of administrative regulations. Although the record does not indicate whether a specific HUD regulation would have been violated if Century Pacific purported to transfer an equitable interest in the property without HUD's approval, it is clear that the HUD regulatory *agreement* would have been violated, and we conclude that that violation of the regulatory agreement in that regard would be a violation of public policy. Thus, under section 139 of the *Restatement*, Lee Pacific's authority to control the properties was terminable.

Furthermore, it appears from the record that the only reason that HUD did not definitively declare that a full TPA was required to accept Lee Pacific's management and control was because Liebreich insisted that Lee Pacific was merely acting as Century Pacific's agent. Liebreich's explanation to HUD regarding Lee Pacific's management and control powers is at odds with the view of the arrangement that Lee Pacific now proposes. Powers held under section 138 are "held for the benefit of the power holder"; powers held in a traditional agency relationship are held for the benefit of the principal. *Hampton Tree Farms, Inc.*, 320 Or at 617.

---

Based on Lee Pacific's assertions, the assignment of right here would be Century Pacific's assignment of the right to be recognized by HUD (the obligor) as the manager and controller of the properties. That assignment also fails, because further provisions of section 317 state that "[a] contractual right can be assigned unless * * * the assignment is forbidden by statute or is otherwise inoperative on grounds of public policy, or * * * [the] assignment is validly precluded by contract." Here, the assignment of the right to control and manage the properties was precluded by the regulatory agreement and HUD's nonapproval of the assignment.

Put differently, Lee Pacific cannot have it both ways. If the settlement agreement conveyed an equitable interest in the property and Lee Pacific's management and control constitutes an agency coupled with an interest, then it follows that Lee Pacific was required to submit a TPA and that its interest was terminable if it failed to do so. If, on the other hand, Lee Pacific's agency powers were not coupled with an interest, then it was a traditional agency relationship subject to the rules regarding traditional principal-agent relationships, including revocability. As Lee Pacific acknowledges, the trial court appeared to rely on traditional agency principles in concluding that Lee Pacific's authority to act as Century Pacific's attorney-in-fact was not of unlimited duration and could therefore be revoked after a reasonable period of time. Section 105 of the *Restatement* states that, if no time period is specified for an agency relationship, the authority terminates "at the end of a reasonable period."

To summarize, if, at the time of execution of the settlement agreement, Lee Pacific's management and control authority constituted powers coupled with an interest, then those powers were terminated as a result of violating the HUD requirement, pursuant to its regulatory agreement with Century Pacific, that the purported equitable transfer of the property be accompanied by the submission of full TPAs. If Lee Pacific had traditional agency authority to manage and control the properties, then its authority was revocable at the end of a reasonable period, and we are bound by the trial court's finding that a reasonable period had lapsed. In short, under either theory of agency, Lee Pacific's continued right to manage and control the properties fails. *See also Scott,* 177 Or at 409 (explaining that the plaintiff's agency authority failed whether it was an agency coupled with an interest or not. If it was not coupled with an interest, the authority was revocable; if the authority was coupled with an interest, it was void for violating a statute).

Thus, as to Lee Pacific's first assignment of error, although our legal analysis differs from the trial court's analysis, we reach the same conclusion as the trial court. Century Pacific did not breach the settlement agreement when it revoked Lee Pacific's authority. Moreover, in light

of the above analysis, Century Pacific was under no duty to submit power of attorney documents to confirm Lee Pacific's asserted right to manage and control the properties, and the trial court did not err in denying Lee Pacific's second claim of relief for specific performance of those submissions.

D. *Did the trial court err in subtracting Century Pacific's asset management fee from the surplus cash in Surfwood Manor?*

Lee Pacific's third assignment of error pertains to the trial court's disposition of Lee Pacific's fifth claim for relief for specific performance, namely, that Century Pacific transfer title in the property Surfwood Manor to Lee Pacific, as required by the settlement agreement. Some additional procedural background is necessary to understand the claim and the trial court's decision. As explained previously in this opinion, 272 Or App at 625-26, the HUD mortgage on Surfwood Manor was satisfied in 2009, and Lee Pacific thereafter sent letters to Century Pacific demanding that it transfer title to Lee Pacific, pursuant to the terms of the settlement agreement. At the time that the trial court issued its June 2010 opinion in this case, Century Pacific had not transferred title to Surfwood Manor, and Lee Pacific then filed an amended complaint, alleging breach of contract in the failure to transfer title and requesting monetary damages under the Surfwood wrap note, sale, and security agreements (designated by the trial court as the third claim for relief), or specific performance of section 11 of the settlement agreement (designated as the fifth claim for relief). Century Pacific argued that, under the trial court's previous ruling in its June 2010 opinion, because Lee Pacific had failed to file a TPA, the condition requiring Century Pacific to fulfill its obligations under the settlement agreement never occurred. Thus, Century Pacific argued, it had no obligation to transfer title. After Lee Pacific brought a summary judgment motion against Century Pacific on these two claims, the trial court ruled that Century Pacific was obligated under the settlement agreement to transfer title, and further ordered Lee Pacific to elect either its third claim for monetary damages or its fifth claim for specific performance of the settlement agreement. Lee Pacific elected its fifth claim.

Thereafter, Century Pacific sent Lee Pacific a deed transferring title to Lee Pacific. Missing from the transfer was the cash surplus account for Surfwood Manor. Century Pacific explained that it had deducted certain expenses from the cash surplus account, including an asset management fee of $154,000.00, paid to Century Pacific for asset management services for Surfwood Manor from 1999 to the time of title transfer. Further litigation between the two parties ensued, and after a trial in June 2011, the trial court entered a July 19, 2011, order granting Lee Pacific $139,081.51 in "equitable damages," having first determined that Century Pacific was entitled to $5,000.00 per year in asset management fees from the time that it revoked Lee Pacific's agency authority to the time that it transferred title in Surfwood Manor to Lee Pacific. The trial court explained its reasoning as follows:

> "I think Oregon law's clear that the Court can award equitable compensation along with specific performance and essentially the Court is * * * attempting to make up for the difference between the agreed-upon performance and the performance that was actually received.

> "The performance that Lee Pacific received in this case was transfer of the property delayed; transfer of the accounts, including the surplus cash account, less certain amounts that had been paid out of those accounts. Which Lee Pacific contends should not have been paid out of those accounts because under the terms of the settlement agreement, Lee Pacific—or Lee Pacific entities were entitled to the full amount of the—that surplus cash account.

> "* * * * *

> "* * * But my understanding is that the parties agreed to a fairly unusual transaction in which title to the property would be retained by the Century Pacific entities. Control of the properties, not just Surfwood but the other properties, * * * would be controlled sort of as an owner but not as the title owner by the Lee Pacific entities, and by Lee Pacific in particular.

> "And so under those circumstances, Century Pacific would not have received any sort of asset management fee. If they had wanted an asset management fee to be paid and transferred, they should have included that

asset management fee in the settlement agreement itself. It was not included, not specified in the settlement agreement. Instead, the transfer is to occur * * * without * * * any additional compensation to be paid to Century Pacific.

"However, * * * what I understood Century Pacific to be gaining out of this agreement was they were avoiding foreclosure of the underlying notes and security agreements. And they were avoiding responsibility * * * as an owner to the extent they could and leaving it up to Mr. Leibreich and Lee Pacific to take on that responsibility, as he did.

"And he exercised that authority up until March 27, 2008, when Century Pacific got tired of waiting for a TPA to be submitted and revoked that authority. So as of that date, Century Pacific was back on the hook, if you will, for the ownership responsibility, full ownership responsibility with respect to the properties in this portfolio.

"* * * I think if the transaction had unfolded the way the parties intended, there would be no asset management fee payable, but Century Pacific would not have had that type of responsibility. It elected to take that responsibility back by terminating the temporary authority that it had granted to Lee Pacific to act as its agent, and so it took back that authority. I think under the best way that I can attempt to put the parties back to make up for the difference between the agreed performance and the performance that was actually received is to grant in part the plaintiff's request for equitable compensation and I'm also going to deny it in part."

Lee Pacific assigns error to the ruling, arguing that the trial court, even acting in equity, could not ignore the unambiguous provisions of section 11 of the settlement agreement, which required Century Pacific to transfer all monies in Surfwood Manor's accounts without first deducting the asset management fee. Lee Pacific's argument raises two separate issues: (1) whether section 11 unambiguously required transfer of the Surfwood Manor accounts without the subtraction of asset management fees; and (2) if so, whether the trial court erred in ignoring that unambiguous provision in its effort to grant "equitable compensation." We start with the first question.

The first question is one of contract interpretation. There is no dispute that section 11 requires Century Pacific to transfer Surfwood Manor's accounts, and there is no dispute that, although not specifically listed, the "surplus cash" account is one of the accounts included in the provisions of section 11. The issue is whether, under the terms of the settlement agreement, the surplus cash account included an expense for asset management fees. Stated another way, was the asset management fee included within the agreement's definition of the surplus cash account? The first step of contract interpretation—considering the meaning of "accounts" in the context of the whole agreement—provides us with no clearer understanding of that term. There is nothing in the settlement agreement that defines the income and expenses that make up the surplus cash account. However, the court may "consider evidence of the circumstances underlying the formation of the contract in its analysis of whether contract terms are ambiguous." *Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 315, 129 P3d 773, *rev den*, 341 Or 366 (2006). In this case, we consider the provisions of the wrap note and security agreements, and the HUD regulatory agreement— all of which are referred to in the settlement agreement—as well as the parties' presettlement agreement conduct pertaining to the surplus cash account.

The HUD regulatory agreement between Century Pacific and HUD provides that the owners or partners of the owning partnership are entitled to annual distributions from the HUD property "only from Surplus Cash and only as permitted by the laws of the state of Oregon and this Agreement." The HUD regulatory agreement defines surplus cash as "any cash remaining at the close of a fiscal year after the payment of * * * [a]ll [o]perating [e]xpenses; * * * payments * * * made to [operations and escrow accounts]; and * * * [a]ll other obligations of the Development[.]" An asset management fee is not considered an operating expense of the properties, as that term is defined in the HUD agreement.

In the 1984 "First Amendment to Agreement of Sale," Century Pacific agreed that, as to each property, the note-holding partnership would "receive all distributable Surplus Cash as payment on the [wrap note], so long as

the [wrap note] is outstanding'" "Surplus Cash," the wrap note states, "shall mean surplus cash as defined in [HUD's] [r]egulatory [a]greement." The undisputed evidence at trial indicated that Lee Pacific annually received the surplus cash and that the surplus cash consisted of what was left over from Surfwood Manor after operating expenses had been deducted. Asset management fees were never deducted. Thus, at the time that the parties entered into the settlement agreement, based on the existing agreements and the parties' course of conduct, the parties objectively manifested an understanding that the surplus cash account consisted of the cash remaining after operating expenses, without any deduction for asset management fees.

Century Pacific argues that the asset management fee is a standard expense that is paid prior to calculating surplus cash. However, Century Pacific's understanding of "surplus cash" is different from the HUD regulatory agreement, which is the basis for the parties' understanding of each property's surplus cash account. Century Pacific's asserted entitlement to an asset management fee deduction is found in its partnership agreement, which provides that compensation to general partners for services rendered "shall be paid solely from surplus cash as defined in [the HUD regulatory agreement]." In other words, compensation fees are not one of the operating expenses or other expenses that are included in HUD's definition of surplus cash. Compensation fees are paid from the already-defined account.

Evidence at trial indicated that the asset management fee is a partnership expense that, under the terms of the partnership agreement, would be deducted after the surplus cash was distributed to the partnership. The partnership would then distribute to the partners what was left over of the surplus cash after subtracting those partnership expenses.[15] Even assuming, as Century Pacific asserts, that the asset management fee is a customary fee assessed by limited partnerships of HUD properties, Century Pacific's

---

[15] Deutch explained that, theoretically, this is how the asset management fees would be deducted. According to industry custom, Deutch explained, the fees would, in actuality, be deducted at the time of a sale of the property and would be a negotiated expense between the buyer and the seller.

partnership agreement is not part of the settlement agreement, and there has been no course of conduct that objectively indicates that the parties mutually understood the asset management fee to be an expense included in the definition of surplus cash. We therefore conclude that, under section 11 of the settlement agreement, the surplus cash account did not include a deduction for asset management fees. Accordingly, under the agreement, Century Pacific was not entitled to deduct those fees.

Having so concluded, we next consider whether the trial court could, nevertheless, ignore the language of the settlement agreement in order to provide equitable compensation. In that regard, we start by considering some of the pertinent provisions of section 11 of the agreement. They include the following: (1) "[Century Pacific] * * * shall, *without further demand, action or compensation* by [Lee Pacific], convey all of that right, title and interest * * * in the Project (including any and all Project accounts, revenues, receivables, associated personal property and real property) to [Lee Pacific], as conveyance *in lieu of foreclosure of the Note*"; and (2) "The obligation to convey the Project *shall not be subject to any condition precedent* other than the arrival of the [date of maturity on the HUD note]." (Emphases added.) Those provisions indicate that a specific consideration was given for these transfers, and that the transfers were to be treated independently of the rest of the contractual provisions and without further compensation to Century Pacific. The trial court's award of specific performance of the transfer of Surfwood Manor seems to acknowledge that, regardless of whether the parties were fully adhering to the rest of the settlement agreement's provisions, the obligation to transfer the properties under section 11 was absolute. Furthermore, Century Pacific, on appeal, does not dispute that it was obligated to transfer Surfwood Manor, pursuant to section 11.

Nevertheless, the trial court ignored the provision of section 11 that Century Pacific was to transfer all accounts, including the surplus cash account as defined by the text and context of the settlement agreement. The trial court's rationale for ignoring this provision was it was acting in equity, granting "equitable compensation along with specific performance and * * * attempting to make up for the

difference between the agreed-upon performance and the performance that was actually received." Lee Pacific argues that the trial court cannot ignore the clear terms of section 11. We agree.

In *Cameron v. Benson*, 295 Or 98, 105, 664 P2d 412 (1983), the Supreme Court stated:

"[T]here are essentially three remedies available once the court, in its discretion, determines that a plaintiff is entitled to specific performance. First, the court can simply award specific performance. Second, the court can award specific performance along with equitable compensation to make up for the difference between the agreed upon performance and that actually received. Finally, the court can, as the trial court did in this case, award specific performance as the primary remedy and also award an alternative money judgment should the defendant fail to perform within a set period of time."

(Footnote omitted and citation omitted.) The trial court here correctly concluded that the circumstances of this case involved awarding "specific performance along with equitable compensation to make up for the difference between the agreed upon performance and that actually received." *Id.* Furthermore, because the compensation was given in conjunction with the request for specific performance of the transfer of title, the trial court properly considered the equities. As the court explained in *Caveny v. Asheim*, 202 Or 195, 218-19, 274 P2d 281 (1954),

"[c]ompensation as incidental relief is especially appropriate when complete specific performance is not available; and as an allowance to be made for any deficiency as to the quantity, quality, or description of the property, when it is clear that jurisdiction properly attaches in equity, compensation flows and is inseparable from the proper relief."

Nevertheless, a court acting in equity "does not have the authority to ignore existing principles of law in favor of its view of the equities." *Nordling v. Cochran*, 98 Or App 747, 750, 780 P2d 805 (1989); *see also First Nat. Bk. v. Multnomah Lbr. & Box Co.*, 125 Or 598, 623, 268 P 63 (1928) ("A court of equity * * * must follow the law."). Moreover, "[a] court of equity cannot, under the guise of 'filling gaps' make

the contract which it thinks the parties would have agreed to." *Booras v. Uyeda*, 295 Or 181, 193, 666 P2d 791 (1983). In this case, in attempting to "make up for the difference between the agreed-upon performance and the performance that was actually received," the trial court essentially filled in gaps that the trial court believed the parties would have agreed to, and ignored certain provisions of section 11. That it could not do. We conclude, therefore, that the trial court erred in deducting asset management fees from the monies in the Surfwood Manor surplus cash account, and that Lee Pacific is entitled to the full $154,000 in that account at the time of the title transfer.

E.  *Did the trial court err in its award of attorney fees?*

Finally, on cross-appeal, Century Pacific assigns error to the trial court's award of attorney fees to Lee Pacific. In light of the fact that the judgment must be reversed and remanded on Lee Pacific's fifth claim for relief, the award of attorney fees is necessarily and concomitantly remanded. ORS 20.220(3)(a) ("If the appellate court reverses the judgment, the award of attorney fees or costs and disbursements shall be deemed reversed[.]").[16]

On appeal, judgment on plaintiffs' fifth claim for relief reversed and remanded, with instructions to enter judgment in favor of plaintiffs on that claim consistent with this opinion; otherwise affirmed. On cross-appeal, award of attorney fees remanded; otherwise affirmed.

---

[16] Although we are remanding the attorney fee award, which is a subject of Century Pacific's cross-appeal, we decline to designate Century Pacific as the prevailing party because Century Pacific did not prevail on any of its substantive arguments in its cross-appeal. Rather, our remand of the attorney fee award is solely attributable to Lee Pacific's successful appeal regarding its fifth claim for relief. *See, e.g., English v. Multnomah County*, 230 Or App 125, 213 P3d 1265 (2009).